FILED
1/11/2016 3:55:13 PM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Lisa Morales

## 2CITS PPS/SOS CIT PPS SAC1

### CAUSE NO. _2016CI00441_

| | | |
|---|---|---|
| WESTHEIMER REGENCY I, L.P. **Plaintiff,** | § § § | IN THE DISTRICT COURT |
| v. | § § | |
| BALLY TOTAL FITNESS CORPORATION; BLAST FITNESS ACQUISITION, LLC; BLAST FITNESS PRESIDENTS SQUARE, LLC; AND HAROLD DIXON, **Defendants** | § § § § § § § | BEXAR COUNTY, TEXAS **166TH** ____ JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Westheimer Regency I, L.P., hereinafter called Plaintiff, complaining of and about Bally Total Fitness Corporation; Blast Fitness Acquisition, LLC; Blast Fitness Presidents Square, LLC; and Harold Dixon hereinafter called Defendants, and for cause of action show unto the Court the following:

### DISCOVERY CONTROL PLAN LEVEL

1.      Plaintiff intends that discovery be conducted under Discovery Level 3.

### PARTIES AND SERVICE

2.      Plaintiff, Westheimer Regency I, L.P., (hereafter "Westheimer") is a Limited Partnership based in Texas.

3.      Defendant, Bally Total Fitness Corporation, is a Foreign For-Profit Corporation doing business in Texas and may be served with process by serving the registered agent of said corporation, CT Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

4.      Defendant, Blast Fitness Acquisition, LLC, is a Foreign For-Profit Corporation registered to do business in Texas and may be served with process by serving the registered agent

**EXHIBIT**
**3**

of said limited liability company, National Registered Agents, Inc., at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

5.      Defendant, Blast Fitness Presidents Square, LLC, is an alleged entity that was never formed, yet executed contracts and conducted business as Blast Fitness.

6.      Defendant, Harold Dixon, is an individual and a citizen of the State of Massachusetts and may be served with process at 63 Cart Path Road, Weston, Massachusetts 02493. Harold Dixon engages in business in the State of Texas, specifically, he has executed contracts with a Texas resident and the parties performed the contract in whole, or in part, in Texas. Harold Dixon does not maintain a regular place of business in Texas or a designated agent for service of process, yet engages in business in Texas and thus, may be served through the Texas Secretary of State.

## CLAIM FOR RELIEF

7.      In accordance with Rule 47(c)(5) of the Texas Rules of Civil Procedure, Plaintiff seeks monetary relief over $1,000,000.

## JURISDICTION

8.      The matter in controversy is within the jurisdictional limits of the district court.

9.      This court has jurisdiction over Defendant Bally Total Fitness because it is a Foreign For-Profit Corporation doing business in Texas.

10.     This court has jurisdiction over Defendant Blast Fitness Acquisition, LLC because it is a Foreign For-Profit Corporation doing business in Texas.

11.     This court has jurisdiction over Defendant Harold Dixon because he has availed himself of the privileges and benefits of conducting business in Texas. Harold Dixon engages in business in the State of Texas, specifically, he executed a contract with Westheimer Regency I,

L.P., a Limited Partnership based in Texas and the parties performed the contract in whole, or in part, in Texas. Harold Dixon executed contracts in Texas on behalf of Blast Fitness as well as in his individual capacity.

## VENUE

12.　　Venue is proper in Bexar County, Texas, pursuant to Texas Civil Practice & Remedies Code 15.0115(a), because the real property is located in Bexar County, Texas.

## EXHIBITS TO PLAINTIFF'S ORIGINAL PETITION

Exhibit A　　Lease Agreement
　　　　　　　Exhibits to Lease Agreement
　　　　　　　　　　Exhibit A – Subordination, Non-Disturbance and Attornment Agreement
　　　　　　　　　　　　Exhibit A- Legal Description of the Property
　　　　　　　　　　　　Exhibit B - Lease
　　　　　　　　　　Exhibit B- Site Plan Showing the Parking Areas and the Common Areas
　　　　　　　　　　　　*This exhibit and Exhibit C are contained within the same document
　　　　　　　　　　Exhibit C- Site Plan Showing the Premises
　　　　　　　　　　　　*This exhibit and Exhibit B are contained within the same document
　　　　　　　　　　Exhibit D- Legal Description of the Shopping Center
　　　　　　　　　　Exhibit E- Approved Plans and Specifications
　　　　　　　　　　　　*Plaintiff is unable to locate this exhibit
　　　　　　　　　　Exhibit F- Sign Plan
　　　　　　　　　　Exhibit G- Unexecuted Guaranty of Bally's Health & Tennis Corporation
　　　　　　　Executed Guaranty of Bally's Health & Tennis Corporation

Exhibit B　　First Amendment to Lease Agreement for Dallas Health Clubs, Inc.

Exhibit C　　Assignment of Lease

Exhibit D　　Letter dated September 27, 2007 RE: Lease Agreement dated July 16, 1992 (as amended, "Lease") by and between President's Square Retail Associates Ltd. ("Landlord") and Bally Total Fitness Corporation ("Tenant") for the premises located at 8725 Marbach Road, San Antonio, TX.

Exhibit E　　Assignment and Assumption of Lease

Exhibit F　　First Amendment to Lease Agreement

*Referred to as "Third Amendment to Lease Agreement" in Plaintiff's
Original Petition

Exhibit G    Special Warranty Deed with Vendor's Lien

Exhibit H    Notice of Default dated November 7, 2014

Exhibit I    Notice of Default dated October 22, 2015

## FACTUAL ALLEGATIONS

13.    Bally Total Fitness Corporation f/k/a Bally's Health & Tennis Corporation of
America is the successor by merger of Dallas Health Clubs, Inc. d/b/a Bally Total Fitness
Corporation.

14.    On or about July 16, 1992, Dallas Health Clubs, Inc. executed a commercial lease
("Lease") with President's Square Retail Associates Ltd. for the premises commonly known as
8725 Marbach Road, San Antonio, Texas 78227 (the "Premises"). A true and correct copy of the
Lease is attached hereto as **Exhibit A** and incorporated by reference for all purposes as if set forth
verbatim.

15.    President's Square Retail Associates, Inc., sold the Premises to Plaintiff,
Westheimer Regency I, L.P.

16.    Under Section 16.18 of the Lease, Bally's Health & Tennis Corporation guaranteed
performance of Tenant, Dallas Health Clubs, Inc.

17.    Under Section 3.1 of the Lease, Tenant is obligated to perform all provisions of the
Lease, including without limitation, payment of monthly installments of rent according to a
specific schedule found in the Lease.

18.    Under Section 12.1 of the Lease, if Tenant fails to make payment of Basic Rent or
Additional Rent when due, and such failure continues for ten (10) days after Tenant receives
written notice thereof from Landlord, then such failure to pay shall be a default under the Lease.

19.     On or about July 17, 1992, Defendant Bally Total Fitness Corporation f/k/a Dallas Health Clubs, Inc. executed the First Amendment to Lease Agreement for the Premises with President's Square Retail Associates Ltd. A true and correct copy of the First Amendment to Lease Agreement is attached hereto as **Exhibit B** and incorporated by reference for all purposes as if set forth verbatim.

20.     On or about February 1, 1993, Defendant Bally Total Fitness Corporation f/k/a Dallas Health Clubs, Inc. executed the Second Amendment to Lease Agreement for the Premises with President's Square Retail Associated Ltd. Plaintiff is unable to locate the Second Amendment to Lease Agreement, but believes it exists pursuant to a collateral document.

21.     On or about June 9, 1994, pursuant to a merger, Dallas Health Clubs, Inc. assigned the Lease to Health & Tennis Corporation of America. A true and correct copy of Assignment to Lease is attached hereto as **Exhibit C** and incorporated by reference for all purposes as if set forth verbatim.

22.     On or about September 27, 2007, Bally Total Fitness Corporation notified President's Square Retail Associates of its election to exercise the Option Term for an additional five (5) years, making the expiration date of the Lease January 31, 2013. A true and correct copy of notice to exercise the Option Term is attached hereto as **Exhibit D** and incorporated by reference for all purposes as if set forth verbatim.

23.     On or about April 30, 2012, Defendant Bally Total Fitness Corporation assigned the Lease to Blast Fitness Acquisition, LLC, also referred to as Blast Fitness Acquisitions, LLC interchangeably throughout the lease documents. The Assignment and Assumption of Lease was signed by Defendant Harold Dixon as manager of Blast Fitness Acquisition, LLC. A true and correct copy of the Assignment and Assumption of Lease is attached hereto as **Exhibit E** and

incorporated herein by reference for all purposes as if set forth verbatim.

24.     On or about May 1, 2012, President's Square Retail Associates, Ltd. and Blast
Fitness Presidents Square, LLC d/b/a Blast Fitness executed the Third Amendment to Lease
Agreement.[1]  A true and correct copy of the Third Amendment to Lease Agreement is attached
hereto as **Exhibit F** and incorporated herein by reference for all purposes as if set forth verbatim.
Under the Third Amendment to Lease Agreement, the lease term was extended for an additional
five years, making the operative term from February 1, 2013 through January 31, 2018. This
amendment was signed by Defendant Harold Dixon as manager of Blast Fitness Presidents Square,
LLC.

25.     Also under the Third Amendment to Lease Agreement, Blast Fitness Acquisition,
LLC guaranteed performance by Blast Fitness Presidents Square, LLC d/b/a/ Blast Fitness.
Defendant, Harold Dixon, executed this amendment on behalf of Blast Fitness Presidents Square.
Because Blast Fitness Presidents Square was never formed, Harold Dixon is personally liable for
the debt of the unformed company.

26.     On or about November 15, 2013, nonparty President's Square Retail Associates,
Ltd. conveyed the Property by special warranty deed to Plaintiff, Westheimer Regency I, L.P. A
true and correct copy of the Special Warranty Deed with Vendor's Lien is attached hereto as
**Exhibit G** and incorporated by reference for all purposes as if set forth verbatim.

27.     Defendant Blast Fitness Acquisition, LLC, Tenant, failed to pay rent to Westheimer
Regency I, L.P., Landlord, for the month of November 2014 and abandoned the Premises in the
middle of the night.

28.     On or about November 7, 2014, Plaintiff Westheimer sent Notice of Default to all

---

[1] There are two separate documents both entitled "First Amendment to Lease Agreement." For purposes of this
Complaint, the most recently executed document will be referred to as "Third Amendment to Lease Agreement."

{00093880}

Defendants. True and correct copies of said notices are attached hereto as **Exhibit H** and incorporated by reference for all purposes as if set forth verbatim.

29.    Defendant Blast Fitness Acquisition, LLC subsequently paid the November rent, curing that default.

30.    On or about November, 26, 2014, Defendant Blast Fitness Acquisition, LLC abandoned the premises in the middle of the night, and failed to pay rent for the month of December or thereafter.

31.    Prior to abandoning the Premises, Defendant Blast Fitness Acquisition, LLC opened a new location at 6727 NW Loop 410, San Antonio, TX 78238, less than 5 miles from the Premises.

32.    On or about October 22, 2015, Plaintiff Westheimer sent Notice of Default to all Defendants.   True and correct copies of said notices are attached hereto as **Exhibit I** and incorporated by reference for all purposes as if set forth verbatim.

33.    Tenant, Blast Fitness Acquisition, LLC, failed to make all required payments of rent under the Lease, and otherwise defaulted thereunder. Specifically, Tenant has not paid rent since its last payment in November 2014. Tenant currently owes Landlord $558,600.00, based on rent of $14,700.00 for each month in past due rent through the expiration of the lease. Tenant also owes Landlord $297,016.44 for monthly NNN fees (real estate taxes and insurance) and $120,253.88 in yearly common area maintenance billings. Additionally, under Section 6.3 Tenant's Maintenance of Premises, Tenant owes Landlord $50,000.00 to replace the windows of the Premises, which were damaged by Tenant while the Premises was under Tenant's control, $20,000.00 for maintenance and clean-up of the Premises, and $38,000.00 for monthly payments for security for the Premises.  In total, Tenant, Blast Fitness Acquisition, LLC, owes Landlord in

the amount of $1,083,870.32.

34.     Bally Total Fitness Corporation is responsible for Plaintiff's losses, because it is the successor in interest to Dallas Health Clubs Inc., the original Tenant under the Lease.

35.     Blast Fitness Acquisition, LLC is responsible for Plaintiff's losses, because pursuant to the Assignment and Assumption of Lease, it is also a Guarantor under the Lease.

36.     Harold R. Dixon is responsible for Plaintiff's losses because he entered into the lease on behalf of a nonexistent entity (Blast Fitness Presidents Square LLC) and therefore is liable in his individual capacity.

**PLAINTIFF'S CAUSE OF ACTION**

**BREACH OF CONTRACT**

37.     Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs. Because of its failure to pay all amounts due under the Lease and perform all of its obligations under the Lease, Tenant, Blast Fitness Acquisition, LLC has breached the Lease, proximately resulting in damages that have been suffered by Landlord, Westheimer Regency I, L.P. As provided by the terms and provisions of the Lease, Landlord is entitled to recover from Tenant all rent and other sums that have or will become due under the terms and provisions of the Lease, for all of which, in the lawful and specified amounts, Landlord hereby sues Tenant.

38.     As a direct and proximate cause of the Defendants breach of contract, Plaintiff has incurred economic loss in the amount of $1,083,870.32 and Plaintiff seeks recovery of its damages.

**ANTICIPATORY REPUDIATION**

39.     Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs. Blast Fitness Acquisition, LLC abandoned the Premises, removed all of its equipment and opened a new facility a few miles away. Because Blast Fitness Acquisition, LLC expressed

in unequivocal and unconditional terms, and without just excuse, its intent to not perform under the Lease in the future, Blast Fitness Acquisition, LLC has breached the Lease.

40. By abandoning the premises and refusing to pay rent since November 2014, Blast Fitness Acquisition, LLC has expressed a distinct, positive, unequivocal and absolute refusal to perform the contract in the future. Blast Fitness Acquisition, LLC's conduct constitutes an anticipatory breach and Landlord is entitled to recover for unpaid rent and other unpaid charges accruing under the Lease through its expiration in January 2018.

41. Plaintiff Landlord is attempting to mitigate damages and relet the Property, but does not currently have a tenant.

42. As a direct and proximate cause of the Defendants breach of contract, Plaintiff has incurred economic loss and damages in excess of the jurisdictional limits of the court.

### CONDITIONS PRECEDENT

43. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred. Plaintiff has made written demand for its damages.

### ATTORNEY'S FEES AND COSTS

44. Based on the foregoing, Landlord employed the undersigned attorney to enforce its rights and the Tenant's obligations under the Lease to include, without limitation, reviewing the facts and initiating and prosecuting the present action based on the Lease. Landlord has agreed to pay the undersigned attorneys their usual and customary fees for such work, the same being reasonable and necessary under the facts and circumstances of this case.

45. Further, the Guaranty of Bally's Health & Tennis Corporation within the Lease provides: "In any action against under this Guaranty, the prevailing party shall be entitled to recover, in addition to damages, its reasonable attorneys' fees and costs incurred in such

proceeding."

46.     Plaintiff requests enforcement of this provision and, upon determining that Plaintiff

has prevailed, asks the Court to award his reasonable attorney fees and costs.

47.     Also, pursuant to Texas Civil Practice and Remedies Code Chapter 38, Defendant

is liable for reasonable attorney's fees and all costs of suit; for all of which Plaintiff hereby sues

Defendant.

**PRAYER**

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff, Westheimer Regency, I, L.P.,

respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final

hearing of the cause, judgment be entered for the Plaintiff against Defendants for damages

requested hereinabove in an amount in excess of the minimum jurisdictional limits of the Court,

together with pre-judgment and post-judgment interest at the maximum rate allowed by law,

attorney's fees, costs of court, and such other and further relief to which the Plaintiff may be

entitled at law or in equity, whether pled or unpled.

Respectfully submitted,

**PULMAN, CAPPUCCIO,**
**PULLEN, BENSON & JONES, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile



*s/Randall A. Pulman*
By: _____
        Randall A. Pulman
        Texas State Bar No. 16393250
        rpulman@pulmanlaw.com
        Sarah A. Sweet
        Texas State Bar No. 24088292
        ssweet@pulmanlaw.com

**AND**

**THE GOTTFRIED FIRM**
West Sixth Place
1505 West Sixth Street
Austin, Texas 78703
Telephone: (512) 494-1481
Facsimile: (512) 472-4013
David M. Gottfried
State Bar of Texas No. 08231200
david@davidgottfriedlaw.com
Meghan Alexander
State Bar of Texas No. 24053960
malexander@alexanderatty.com
Michael Jurgens
State Bar of Texas No. 24084319
michael@davidgottfriedlaw.com
Tara Gillespie
State Bar of Texas No. 24098880
tara@davidgottfriedlaw.com

**ATTORNEYS FOR PLAINTIFF**
**WESTHEIMER REGENCY, I, L.P.**

23,125⁴



# LEASE AGREEMENT

## FOR

### DALLAS HEALTH CLUBS, INC.
### INTERNATIONAL SQUARE
### SAN ANTONIO, TEXAS


**LANDLORD:**          PRESIDENT'S SQUARE LIMITED PARTNERSHIP
                       c/o John Cole
                       10440 North Central Expressway
                       LB 702, Suite 702
                       Dallas, Texas  75231-2215


**TENANT:**            DALLAS HEALTH CLUBS, INC.
                       d/b/a PRESIDENT'S HEALTH CLUBS
                       13714 Gamma Road
                       Suite 100
                       Dallas, Texas  75240

**LEASE TERM:**        15 Years; 1 5-Year Option



EXHIBIT
A
Page 12 of __

INDEX TO LEASE AGREEMENT

INTRODUCTION        LANDLORD - TENANT

RECITALS

DEFINITIONS

ARTICLE 1     THE CONVEYANCE

        1.1     Landlord's Acquisition and Zoning
        1.2     The Lease of the Premises
        1.3     Uses
        1.4     Landlord's Representations and Warranties
        1.5     Certain Landlord's Covenants
        1.6     Breach of Representations, Warranties and
                Covenants
        1.7     Title Insurance

ARTICLE 2     TERM

        2.1     Term and Rental Commencement Date
        2.2     Permits
        2.3     Option To Extend

ARTICLE 3     RENT

        3.1     Basic Rent
        3.2     Rent During Option Term
        3.3     Place to Pay Rent
        3.4     Net Lease

ARTICLE 4     ADDITIONAL RENT

        4.1     Taxes
        4.2     Tax Refund
        4.3     Tenant's Right to Contest Real Property
                And Other Taxes
        4.4     Utility Charges
        4.5     Maintenance Charges and Other Operating
                Costs

ARTICLE 5     CONSTRUCTION

        5.1     Tenant's Improvements
        5.2     Plans and Specifications

i

|       | 5.3 | Time of Completion |
|       | 5.4 | Landlord's Right of Inspection |
|       | 5.5 | Landlord's Delivery of the Premises |
|       | 5.6 | Force Majeure |

ARTICLE 6    USE OF PREMISES

|       | 6.1 | Quiet Enjoyment |
|       | 6.2 | Compliance with Laws |
|       | 6.3 | Tenant's Maintenance of Premises |
|       | 6.4 | Exterior Signs |

ARTICLE 7    INSURANCE

|       | 7.1 | Tenant's Insurance |
|       | 7.2 | Property and Liability Insurance |
|       | 7.3 | Liability Insurance |
|       | 7.4 | Landlord as Additional Insured |
|       | 7.5 | Proration of Insurance Premiums |
|       | 7.6 | Waiver of Subrogation |

ARTICLE 8    REPAIRS AND ALTERATIONS

|       | 8.1 | Maintenance and Repairs |
|       | 8.2 | Alterations |
|       | 8.3 | Work Costing Less than One Hundred Thousand and No/100 Dollars ($100,000.00) |
|       | 8.4 | Work Costing More than One Hundred Thousand and No/100 Dollars ($100,000.00) |
|       | 8.5 | Work to Comply with Laws |
|       | 8.6 | Mechanics' Liens |

ARTICLE 9    DAMAGE OR DESTRUCTION

|       | 9.1 | Restoration after Damage or Destruction |
|       | 9.2 | Tenant to Submit Plans for Restoration Within Ninety (90) days |
|       | 9.3 | Payment for Restoration |
|       | 9.4 | Disposition of Excess Insurance Proceeds |
|       | 9.5 | Restoration Near End of Term |

ARTICLE 10    ASSIGNMENTS AND SUBLEASES

|       | 10.1 | Assignment to Affiliate |
|       | 10.2 | Assignment or Subletting |
|       | 10.3 | Consent of Landlord to Assignments or Subleases |

ii

Case 5:16-cv-00214-FB   Document 1-3   Filed 02/29/16   Page 15 of 124

ARTICLE 11      INDEMNIFICATION

11.1    Indemnification of Landlord
11.2    Payment of Litigation Expenses
11.3    Indemnification of Tenant
11.4    Payment of Litigation Expenses

ARTICLE 12      DEFAULT BY TENANT OR LANDLORD

12.1    Default in Payment of Rent
12.2    Non-Monetary Defaults
12.3    Financial Defaults
12.4    Landlord's Remedies
12.5    Rights Upon Holding Over
12.6    Landlord's Right to Perform Tenant's Covenants
12.7    Tenant's Right to Perform Landlord's Covenants

ARTICLE 13      CONDEMNATION

13.1    Total Taking
13.2    Partial Taking
13.3    Restoration
13.4    Distribution of Award

ARTICLE 14      MORTGAGE OR ENCUMBRANCE OF LEASEHOLD INTEREST

ARTICLE 15      PRIORITY OF LEASE

15.1    Lease to be Prior to any Encumbrance
15.2    Subordination and Non-Disturbance
15.3    Execution of Subordination Documents

ARTICLE 16      MISCELLANEOUS

16.1    Manner of Giving Notice
16.2    Modification of Lease
16.3    Covenants Severable
16.4    Payment Under Protest
16.5    Performance Under Protest
16.6    Singular and Plural
16.7    Captions
16.8    Landlord's Billings
16.9    Short Form Lease

iii

Case Number: 2016CI00441          Document Type: PLAINTIFFS ORIGINAL PETITION     Page 15 of 121

16.10   Landlord's Access To Premises
16.11   Choice of Law
16.12   Heirs and Assigns
16.13   Estoppel Certificate By Tenant
16.14   Broker
16.15   Exclusivity
16.16   Pre-Sales Premises and Temporary Signs
16.17   Environmental Matters
16.18   Guaranty

EXHIBIT A     Subordination, Non-Disturbance and Attornment Agreement

EXHIBIT B     Site Plan Showing Parking Areas and Common Areas

EXHIBIT C     Site Plan Showing the Premises

EXHIBIT D     Legal Description of Shopping Center

EXHIBIT E     Approved Plans and Specifications

EXHIBIT F     Sign Plan

EXHIBIT G     Guaranty of Bally's Health & Tennis Corporation

iv

LEASE

INTRODUCTION

THIS LEASE is made on July _lb_, 1992, between PRESIDENT'S SQUARE LIMITED PARTNERSHIP, a Texas limited partnership, as landlord ("Landlord"), having its principal place of business at 8715 Marbach Road, San Antonio, Texas consisting of TWENTY-TWENTY PROPERTIES, INC., a Texas corporation, as its general partner (the "General Partner") and JOHN COLE, an individual resident of Texas, MELVA COLE, an individual resident of Texas and BRIAN PICKETT, M.D., an individual resident of Texas, as limited partners (collectively, the "Limited Partners") and DALLAS HEALTH CLUBS, INC., a Texas corporation, doing business as PRESIDENT'S HEALTH CLUB, having its principal place of business located at 13714 Gamma Road, Suite 100, Dallas, Texas  75240, as tenant ("Tenant").

RECITALS

1.    As described herein, Tenant wishes to lease the Premises and to use the Common Areas and the Parking Areas in the Shopping Center for Tenant's Uses. Landlord does not presently own, but has contracted to purchase the Shopping Center in which the Premises are located.  The Premises are not presently zoned for Tenant's Uses.  Landlord has agreed to obtain permanent zoning for the Premises to permit Tenant's Uses.

2.    If Landlord purchases the Shopping Center and obtains such permanent zoning, Tenant then needs to obtain such governmental approvals as are necessary to construct the Tenant's Improvements, to obtain such governmental approvals as are necessary to occupy the Premises and to receive a Non-Disturbance Agreement from Landlord's lender.

3.    To accomplish these and other matters described herein, the parties have entered into this Lease.

DEFINITIONS

For purposes of this Lease, the following terms shall have the meanings set forth below:

1.    "ADA" shall mean the federal statute commonly referred to as the Americans with Disabilities Act.

1

2.   "Additional   Rent"   shall   mean   "Tenants
     Proportionate Share" of the sum of Taxes
     (Section 4.1), Utility Charges (Section 4.4)
     and Maintenance Charges and Other Operating
     Costs (Section 4.5) to be paid by Tenant under
     this Lease.

3.   "Alteration Work" (Section 8.2) shall mean any
     work performed by and paid for by Tenant
     during the term of this Lease which alters the
     interior of the "Premises."

4.   "Area" shall mean approximately twenty-three
     thousand   one   hundred   twenty   five   (23,125)
     square feet of the interior of the "Premises."

5.   "Basic   Rent"   shall   mean   the   annual   sums
     described in Section 3.1 of this Lease.

6.   "Common   Areas"   shall   mean   all   facilities   in
     the   "Shopping   Center"   which   are   for   the
     general use, .in common, of occupants of the
     "Shopping Center" (including Tenant hereunder,
     its officers, agents, employees, invitees and
     customers),   which   facilities   shall   include,
     but are not limited to, the "Parking Areas,"
     exits, entrances, means of ingress and egress,
     driveways,   turn-arounds,   curb   cuts,   streets,
     sidewalks,   walkways,   service   areas,   roadways,
     loading docks, ramps and platforms, drainage
     and plumbing systems, canopies, utilities,
     ramps,   landscaped   areas   and   other   similar
     facilities available for common use within the
     "Shopping Center."

7.   "Effective Date" shall mean the date upon
     which Landlord (a) is granted permanent "B-2"
     zoning status for the "Shopping Center," and
     (b) acquires good fee simple title to the
     "Shopping Center" as described in Section 1.1
     of this Lease.

8.   "Environmental   Laws"   shall   mean   the
     Comprehensive   Environmental   Response,
     Compensation and Liability Act, 42 U.S.C.
     §9601, et. seq. ("CERCLA"), and any other
     applicable   federal,   state   or   local   law,
     regulation,   ordinance   or   requirement,   as
     amended or as hereinafter amended pertaining
     to "Hazardous Substances."

2

9.    "Force Majeure" shall mean strikes, lockouts, civil commotion, war or war-like operation, invasion, rebellion, hostilities, military action or power, sabotage, unavailability of materials, failure of power, restrictive governmental laws or regulations, riots, insurrections, acts of god, severe weather conditions or other reasons beyond either Landlord's or Tenants' reasonable control, which prevent or delay the performance of any act required in this Lease.



10.   "Guarantor" shall mean BALLY'S HEALTH & TENNIS CORPORATION, a Delaware corporation, having its principal place of business located at 2029 Century Park East, Suite 2810, Los Angeles, California 90067.

11.   "Hazardous Substances" means hazardous substances or hazardous wastes, as those terms are defined by the Environmental Laws. "Hazardous Substances" shall also include, but not be limited to, petroleum and petroleum products, including but not limited to, crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure (60 degrees Fahrenheit and 14.7 pounds per square inch) and any radioactive material, including but not limited to, any source, special nuclear or by-product material as defined at 42 U.S.C. § 2011, et seq., as amended or hereafter amended, and asbestos in any form or condition.

12.   "Initial Term" shall mean the fifteen (15) year period beginning on the "Rental Commencement Date."

13.   "Insurance Proceeds" shall mean the collective proceeds of insurance carried by Tenant, pursuant to Section 7.1 and Section 7.3 of this Lease, and by Landlord, pursuant to Section 7.2 of this Lease.

14.   "Lease Term" shall mean the Initial Term plus any exercised "Option Term" under this Lease.

15.   "Lease Year" shall mean a period of twelve (12) months commencing with the "Rental Commencement Date" and ending on each successive period of twelve (12) months thereafter.

3

16.   "Non-Disturbance Agreement" shall mean the Subordination, Non-Disturbance and Attornment Agreement described in Section 15.2 of this Lease in the form attached hereto as Exhibit A.

17.   "Operating Costs" shall (a) include, without limitation, the costs of operating, repairing, lighting, cleaning, maintaining (including maintenance service agreements at market rates with independent third parties), painting, securing and managing the Common Areas, insuring the Common Areas against personal injury, property damage, fire, theft, flood or other casualty, and payment of general and special real estate taxes for the Common Areas (except as otherwise specifically provided in this Lease), excluding penalties and interest for late payment thereof, assessed or imposed upon the Common Areas (other than income, inheritance and franchise taxes thereon) during each Lease Year of the Lease.

(b)   Anything contained in paragraph (a) above or elsewhere in this Lease to the contrary notwithstanding, (i) wages, unemployment and social security taxes of Landlord's employees shall be for only those employees who work on or for the "Shopping Center" or on an allocated amount of wages, unemployment and social security taxes for employees who are not exclusively employed on or for the "Shopping Center;" (ii) there shall be excluded from "Operating Costs" (A) principal and interest payments on debt and depreciation of any assets, (B) capital improvements, replacements and depreciation as defined or described by generally accepted accounting principles and the Internal Revenue Code, as amended, and regulations promulgated thereunder, (C) costs of alterations, maintenance and repairs to premises of other tenants, (D) real estate brokerage and leasing commissions and expenses such as advertising, (E) repairs or other work occasioned by a casualty, (F) legal expenses, (G) maintenance reserves, (H) any expense for which Landlord has been reimbursed to the extent of such reimbursement, and (I) franchise, income and other such taxes; and (iii) all management fees and costs included in "Operating Costs" shall be at market rates and shall not exceed

4

what said costs would be if charged by arm's-
length third party suppliers, servicers or
contractors but in no event may any management
fee or third party management fee exceed five
percent (5%) of total "Operating Costs,"
exclusive of real property taxes, assessments
and insurance.

18. "Option Term" shall mean the five (5) year
period beginning immediately upon the
expiration of the Initial Term if Tenant
exercises its option to renew the Lease.

19. "Parking Areas" shall mean those areas of the
"Shopping Center" designated for parking and
delineated on Exhibit B attached hereto and
made a part hereof.

20. "Premises" shall mean the building outlined in
red on Exhibit C attached hereto and made a
part hereof.

21. "Rent" shall mean the sum of Basic Rent plus
Additional Rent.

22. "Rental Commencement Date" shall mean the date
on which Tenant either obtains its Certifi-
cate of Occupancy or final Certificate of
Compliance for the Premises or the date Tenant
opens its doors for business, whichever is
sooner.

23. "Restoration Work" shall mean any work to be
performed by Tenant to repair and restore the
Premises following the damage or destruction
of the Premises by fire or other casualty, in
whole or in part.

24. "Shopping Center" shall mean that certain real
property in which the Premises are located,
commonly known as International Square
Shopping Center at 8715 Marbach Road, in San
Antonio, Texas, legally described on Exhibit D
attached hereto and made a part hereof, and
all improvements thereon and to be constructed
thereon and appurtences thereto, whether now
existing or to be constructed or created.

25. "Taxes" shall mean general and special real
estate taxes imposed upon the Shopping Center
or any similar tax specifically imposed in
lieu of such real estate taxes.

5

26. "Tax Year" shall mean the fiscal year used by the taxing authorities imposing the Taxes.

27. "Tenant's Improvements" shall mean the improvements to be constructed by, or caused to be constructed by Tenant described in Article 5 of this Lease designed to meet the "Tenant's Uses."

28. "Tenant's Proportionate Share" shall mean that fraction, the numerator of which shall be the number of square feet of floor area of the Premises and the denominator of which shall be the number of square feet of gross leasable area of the Shopping Center (which shall not be less than forty-six thousand five hundred and nine (46,509) square feet).

29. "Tenant's Uses" shall mean the use of the Premises as a health and fitness center offering fitness programs and recreational facilities which may include, but not be limited to, at Tenant's sole discretion, a jogging track, gymnasiums, locker rooms, washrooms, showers, toilets, swimming pool, whirlpools, saunas, aerobics and/or floor exercise, racquetball courts, free weights, exercise machinery and equipment, massage, physical therapy, child nursery facilities, restaurant, juice bar, incidental retail sales activities, and other usual amenities found in a modern health club facility.

## 1. THE CONVEYANCE

1.1 LANDLORD'S ACQUISITION AND ZONING. Tenant wishes to lease the Premises for Tenant's Uses. As of the date of this Lease, Landlord does not have title to the Shopping Center in which the Premises are located. Landlord shall use its best efforts to acquire fee simple title to the Shopping Center. The Shopping Center is presently zoned Temporary "R-1" and a registration of a non-conforming "B-2" use has been filed with the City of San Antonio Department of Building Inspections. Landlord shall apply for permanent "B-2" zoning status for the Shopping Center, including, without limitation, the Premises, as soon as is practicable and use its best efforts to obtain such zoning. The obtaining of such fee simple title and permanent zoning are conditions precedent to Tenant's obligations under this Lease. If Landlord does not obtain permanent "B-2" zoning for the Shopping Center and the Premises within forty-five (45) days after the execution of this Lease, or does not acquire good fee simple title

6

to all of the Shopping Center within ninety (90) days after the
execution of this Lease, in either event, Tenant may, in its sole
and absolute discretion terminate this Lease with no further
obligations of Tenant.

1.2   THE LEASE OF THE PREMISES.   (a)   As of the Effective
Date, Landlord does hereby lease and demise to Tenant and Tenant
does hereby lease and take from Landlord, the Premises, and all
parking rights and uses relating to the Parking Areas, which
parking rights and uses are hereby assigned to Tenant for its use,
occupancy and benefit, and the use, occupancy and benefit of
Tenant's customers, employees, agents and invitees during the Lease
Term.   Landlord hereby also grants to Tenant, as of the Effective
Date, a nonexclusive easement coterminous with the Lease Term for
all Common Areas in and to the Shopping Center.   Landlord
acknowledges that Tenant's continued rights in and to the Common
Areas and the Parking Areas, are material inducements for Tenant to
enter into this Lease.   Landlord hereby also grants, as of the
Effective Date, an easement coterminous with the Lease Term for
installation and/or maintenance of telecommunications equipment,
utilities and heating, ventilating and air conditioning ("HVAC").

(b)   Tenant shall construct Tenant's Improvements as more
fully described in Article 5 below.   After the Tenant's
Improvements are completed, Tenant shall have the right to have the
Premises measured by its architects.   If the measurement of the
Premises (from the outside face of the exterior walls and from the
centerline of walls shared with other premises) is smaller or
larger than the Area, Tenant's Proportionate Share and Rent shall
be adjusted to conform to said measurement for all purposes of this
Lease.

(c)   Landlord agrees that:

   (i)   During the term of this Lease, the
         Parking Areas shall not contain less
         than two hundred eighty (280)
         parking spaces;

   (ii)  None of the parking lot
         configuration, traffic patterns
         (both vehicular and pedestrian),
         rights to egress and ingress, curbs,
         driveways and walkways shall be
         reconfigured, reconstructed,
         redirected, or altered without
         Tenant's prior written consent,
         including, without limitation,
         reduction in the number or size, or
         both, of any parking spaces in the
         Parking Areas; and

7



    (iii)    Except for the twenty-five (25) parking spaces that are not adjacent to the Premises as described in Section 1.4(e) below, which twenty-five (25) spaces shall be in the area indicated as "Reserved Parking" on Exhibit B attached hereto, Landlord has not nor shall Landlord grant nor cause to be granted "exclusive parking" or "designated parking" rights to any Parking Areas or easements, other than as may be required under the ADA or similar law.

1.3   USES. At Tenant's sole discretion, the Premises may be used and occupied for Tenant's Uses between the hours of 6:00 a.m. to midnight, seven (7) days a week, and it shall be a condition of this Lease that Tenant shall be permitted by Landlord and all applicable governmental agencies to use the Premises during all such days and hours.

1.4   LANDLORD'S REPRESENTATIONS AND WARRANTIES. Landlord represents and warrants to Tenant as of the date hereof (unless expressly set forth otherwise) as follows:

    (a)    Landlord is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Texas. The General Partner is a corporation, duly organized, validly existing and in good standing in the State of Texas and is duly qualified as foreign corporation in all states in which it is required to be so qualified. As of the Effective Date, Landlord shall have all requisite power to own and lease its properties and assets, including, without limitation, the Shopping Center and the Premises, and to carry on its business as and where presently conducted.

    (b)    The General Partner has full authority to act on behalf of Landlord. Landlord has the full right, power and lawful authority to enter into this Lease, and as of the Effective Date, to lease the Premises, and to perform all of Landlord's obligations hereunder. All proceedings required by or on the part of Landlord to authorize Landlord to execute, deliver and carry out this Lease have been duly and properly taken or will have been taken as of the Effective Date. This Lease

8

constitutes a legal, valid, binding and enforceable obligation of Landlord and each of its partners, including, without limitation, the General Partner.

(c) The execution and delivery of this Lease by Landlord, compliance with its terms and consummation of the transactions contemplated hereby will not violate, conflict with or result in a breach of any provisions of Landlord's limited partnership agreement or certificate of limited partnership or the General Partner's Certificate of Incorporation or Bylaws or constitute a default, require third party consent or result in the creation of a lien or a right of acceleration under, or otherwise result in a breach or violation of, any contract, commitment, indenture, mortgage, easement, restriction, covenant, note, bond, license, lease, deed of trust or other instrument or obligation, or any judgment, order or decree of any court, administrative agency or other governmental authority, to which Landlord or any of its partners is a party or by which the Shopping Center, including, without limitation, the Premises, may otherwise be bound.

(d) As of the Effective Date, Landlord shall have good, indefeasible and insurable fee simple title to the Shopping Center, including without limitation, the Premises and the Common Areas, free and clear of all liens, claims, encumbrances, easements and tenancies (except the liens, claims and easements disclosed in the leasehold title insurance policy described in Section 1.7 below, the lien represented by the "Mortgage" in favor of Lender as more fully described in Section 15.2 below and any lien for current year's real estate taxes not yet due and payable). No lien, encumbrance, easement or tenancy shall interfere with or diminish Tenant's right to quiet enjoyment described in Section 6.1 below.

(e) There are currently not less than two hundred eighty (280) parking spaces in the Parking Areas. Of these, twenty-five (25) spaces, which are indicated on Exhibit B, are reserved for or may be designated by Landlord for use by other tenants of the Shopping Center,

9

including, without limitation, Enterprise Rent-A-Car, which use by Enterprise Rent-A-Car shall terminate within sixty (60) days after the Effective Date. There also are eight (8) spaces required under the ADA or similar law to be reserved to comply with such law. Except as expressly reserved above, all of the remaining parking spaces shall be available on a non-exclusive basis for parking by customers, employees, suppliers and invitees of all tenants of the Shopping Center including Tenant.

(f)   The Shopping Center has forty six-thousand five hundred and nine (46,509) square feet of leasable space.

(g)   The Taxes for the Shopping Center for 1991 were Forty Two Thousand Seventy Four and 70/100 Dollars ($42,074.70). All Shopping Center Taxes are current and Landlord has received no written notice from any taxing authority and has no actual knowledge of any special charges or assessments levied or proposed to be levied against the Shopping Center or any part thereof.

(h)   Landlord has no knowledge of any fact, action or proceeding, whether actual, pending or threatened, which could result in a modification or termination of the zoning status of the Shopping Center and the Premises or which would prevent the granting of the permanent "B-2" zoning status to be applied for by Landlord pursuant to Section 1.1 above.

(i)   After the Effective Date, except for the use of approximately six hundred (600) square feet of space in the Shopping Center by Enterprise Rent-A-Car, which use requires "B-3" zoning which use shall not, in the reasonable opinion of Tenant, adversely affect, diminish or interfere with Tenant's right to quiet enjoyment described in Section 6.1 below, neither the Shopping Center nor the Premises will violate any applicable zoning ordinance, fire regulation, building code, health code or other governmental ordinance, order or restriction. Landlord shall take whatever reasonable action as is necessary to terminate the above-described nonconforming tenancy as soon as is practicable.

10

(j) Landlord has no knowledge of any obligations of Tenant to Landlord or any third party other than those described in this Lease, including without limitation, the requirement of obtaining consents from any third party to permit Tenant to have use of the Common Areas, including, without limitation, the Parking Areas, as described in this Lease.

(k) Landlord has not received notice of and has no knowledge with respect to either the Shopping Center or the Premises being in violation of any Environmental Laws.

(l) After the Effective Date, Tenant's Uses and the utilization of the Common Areas and the Parking Areas pursuant to this Lease are and will be in full compliance with all applicable zoning, land use and building codes and ordinances and no amendment, variation, special use or any other such application or proceeding under any applicable code or ordinance is necessary for Tenant's Uses and Tenant's enjoyment of the Premises, the Common Areas and the Parking Areas and all applicable governmental bodies and agencies will have approved the adequacy of and the number of spaces in the Parking Areas available for Tenant's Uses.

(m) There are no agreements relating to the Shopping Center or the Premises with any municipality, governmental unit or subdivision which are not described herein. After the Effective Date, no amendments, variations, special use permits or changes to any applicable zoning ordinance are required for either Landlord or Tenant to do any work to be done by either of them as described in this Lease.

(n) There is no pending or, to the knowledge of Landlord, threatened condemnation or similar proceeding affecting the Shopping Center, including, without limitation, the Premises, and Landlord is not aware of any facts or circumstances which might result in such suit or other proceedings.

(o) Neither the State of Texas nor any applicable county, municipal corporation or municipality has any sales or rent tax applicable to any

11

payments to be made herein, including, without limitation, payments of Rent.

(p)   All buildings, including, without limitation, their respective foundations, exterior walls, structural members, roof, utilities and systems in the Shopping Center, including, without limitation, the Premises, are in good physical condition, repair and order and are structurally fit for the purposes for which they are used or are intended to be used and are free from latent defects.

1.5   CERTAIN LANDLORD'S COVENANTS.   Landlord agrees as follows:

(a)   Landlord shall continuously from the Effective Date throughout the Lease Term, maintain fire and extended coverage insurance (other than for Tenant's Improvements) on a one hundred percent (100%) replacement cost basis in a sufficient amount to rebuild the Premises, public liability insurance to at least the same limit and deductible required of Tenant in Section 7.3 below, contractual liability for all Landlord indemnifications contained in this Lease and workers' compensation insurance on the Shopping Center, including the Premises (other than for Tenant's Improvements) from carrier(s) admitted to insure such risks in Texas and being reasonably acceptable to Tenant, and shall furnish Tenant on an annual basis (or sooner if within any Lease Year there is a change or renewal of any such insurance policy, at such time of the change or renewal) with standard insurance certificates therefor identifying Tenant as an additional insured, for the Lease Term.

(b)   If Landlord commences a case or has a case filed against it under Title 11 of the United States Code, as amended, relating to Bankruptcy, then Landlord as a debtor-in-possession, or any Trustee for Landlord, agrees promptly, within no more than sixty (60) days after request by Tenant to the Bankruptcy Court, to assume or reject this Lease and Landlord on behalf of itself, and any Trustee agrees not to seek or request from such Court any extension or adjournment of any application by Tenant to assume or reject this Lease.

12

(c)   As soon as practicable after the Effective Date, but in no event later than thirty (30) days after the Effective Date, Landlord shall change the name of the Shopping Center from "International Square" to "President's Square." Landlord shall prepare and file at Landlord's sole cost and expense, as soon as is practicable, all documents necessary to evidence and effect such name change and shall take all other actions necessary to effect such name change.

(d)   After the Effective Date, except for the use of approximately six hundred (600) square feet of space in the Shopping Center by Enterprise Rent-A-Car, which use requires "B-3" zoning, and which use shall not, in the reasonable opinion of Tenant, adversely affect, diminish or interfere with Tenant's right to quiet enjoyment described in Section 6.1 below, Landlord shall comply with all applicable laws, ordinances, regulations, statutes, rules and restrictions pertaining to and affecting the Shopping Center, including, without limitation, the Premises, the Common Areas and the Parking Areas. Landlord shall maintain the Shopping Center in accordance with and, if required, bring it into compliance with all applicable zoning ordinances, fire regulations, building codes, health codes, ADA, and other governmental ordinances, orders or restrictions and shall maintain and keep all covenants, restrictions and other agreements of record without modification and, free from any default. Landlord shall take whatever reasonable action as is necessary to terminate the above-described, nonconforming tenancy as soon as is practicable.

(e)   The visibility of the Premises and its signage from the surrounding streets shall not be impaired by any buildings, or signs located within the Shopping Center, or otherwise constructed by Landlord, its agents, employees or other representatives, not shown on Exhibit B.

1.6   REMEDIES FOR CERTAIN BREACHES.

In the event of breach of any of the covenants of Landlord set forth in Section 1.2(c) above, any of the representations or warranties of Landlord set forth in Section 1.4 above or any of the

13

covenants of Landlord set forth in Section 1.5 above, Tenant, in its sole discretion, may (A) (i) in the event of a breach of any of the covenants set forth in Section 1.2(c) above or (ii) in the event of a breach of any of the representations or warranties set forth in paragraphs (a), (b), (c), (d) or (e) of Section 1.4 above or, in the event of a breach of the representations or warranties set forth in paragraphs (h), (i), (j), (k), (l), (m), (n) or (p) of Section 1.4 above, if, in the reasonable opinion of Tenant, such breach adversely affects, diminishes or interferes with Tenant's right to quiet enjoyment described in Section 6.1 below, or (iii) in the event of the breach of any of the covenants set forth in paragraphs (b), (c), (d) or (e) of Section 1.5 above, if, in the reasonable opinion of Tenant, such breach adversely affects, diminishes or interferes with Tenant's right to quiet enjoyment described in Section 6.1 below, terminate this Lease with no further obligations of Tenant and recover from Landlord all of Tenant's costs and expenses, including, without limitation, the unamortized cost of Tenant's Improvements paid by Tenant, plus fifteen percent (15%) per annum thereon, reasonable architecture, engineering and legal fees and expenses incurred by Tenant in finding the Premises, designing the Premises and planning Tenant's Improvements, negotiating and documenting this Lease and enforcing or attempting to enforce this Lease, or (B) set off all losses and expenses suffered by Tenant on account of such breach against the Rent payments then due and coming due hereunder and/or (C) pursue Tenant's remedies otherwise provided in this Lease, in addition to those remedies available to Tenant at law or equity, including, without limitation, the right to injunctive relief, cumulatively or alternatively, singularly or in combination. With regard to the breach of any of the covenants of Landlord described in Section 1.2(c), Section 1.4 above or Section 1.5 above, Tenant shall deliver written notice of such breach and Landlord shall immediately begin such action to cure such breach and shall have fifteen (15) days to cure such breach (provided, however, that if such breach is of the nature that cannot be cured within such fifteen (15) day period, so long as Landlord diligently prosecutes the cure of such breach, the failure to cure such breach within said period shall not constitute a default under this Lease, but in no event shall such breach exist for a period of forty-five (45) days or more).

    1.7   TITLE INSURANCE.

    If not obtained prior to mutual execution and delivery of this Lease, it shall be a condition precedent to all of Tenant's obligations hereunder that Tenant shall receive at Tenant's sole expense and Landlord shall diligently and promptly apply for same, a leasehold policy of title insurance in its favor in the amount of at least Eight Hundred Thousand and No/100 Dollars ($800,000.00), issued by Stewart Title Insurance Company identical to its commitment File No. 92500120 dated May 7, 1992, except in the following particulars:

14

(i)   only Taxes for 1991 and subsequent years may be shown as unpaid.

(ii)  zoning endorsement shall specify the entire TENANT'S USES.

(iii) EXHIBIT A - LEGAL DESCRIPTION's first paragraph shall be replaced by: "Parcel 1: operating lease for San Antonio, Texas consisting of twenty-three thousand one hundred twenty five (23,125) sq. ft. of ground floor space created by Lease dated July 16, 1992 between and Dallas Health Clubs, Inc. ("Lease"), a short form of which was recorded _____, 1992, in the Bexar County, Texas Land Records under County Clerk's file No. _____, demising and leasing for a term beginning on the "Rental Commencement Date," as therein defined, and ending fifteen (15) years later with one (1) five (5) year option, the said premises which are situated on the following described property, to wit:

[legal description to be mutually agreed upon by Landlord and Tenant's respective counsel].

Parcel 2: A non-exclusive easement for the use of the "Common Areas" and the "Parking Areas" as defined in Lease.

(iv)  In general, any Schedule B exceptions which do not apply to the property in question shall be deleted.

If Tenant has not received said title policy within ten (10) days after the Effective Date, Tenant shall be entitled, at its sole discretion exercised within five (5) days thereafter, to obtain such title policy and to offset the cost thereof against the Basic Rent, plus a charge of fifteen percent (15%) of the amounts thereof or to terminate this Lease with no further obligations of Tenant and recover from Landlord all of Tenant's costs and expenses, including, without limitation, reasonable architecture, engineering and legal fees incurred by Tenant in finding the Premises, designing the Premises and planning Tenant's Improvements, negotiating and documenting this Lease and enforcing or attempting to enforce this Lease.

15

## 2. TERM

2.1   TERM AND RENTAL COMMENCEMENT DATE.

(a)   Subject to the conditions expressly described in this Lease, the term of this Lease shall begin on the date of execution and shall terminate at the end of fifteen (15) years following the Rental Commencement Date. If the term of this Lease shall commence on a date other than the first day of a calendar month, the Lease Term shall be extended by that number of days following the first day of a calendar month.

(b)   Tenant's obligation to pay Rent, if any, shall commence on the Rental Commencement Date.  If the term of this Lease should commence on a date other than the first day of a calendar month, the monthly installment of the annual Rent for the calendar month shall be prorated accordingly. Notwithstanding anything to the contrary set forth above, the Rental Commencement Date shall be postponed if there are delays for _force majeure_ reasons as set forth in Section 5.6 below.

2.2   PERMITS.  If within forty-five (45) days of Tenant's application therefore, Tenant is unable to obtain all necessary certificates, permits and governmental approvals to construct Tenant's Improvements and for Tenant's Uses of the Premises after good faith efforts to obtain the same, then Tenant, in its sole and absolute discretion, may (a) if such failure is due to any action or inaction by Landlord, terminate this Lease by written notice to Landlord, without any liability to Landlord whatsoever or (b) continue under this Lease, provided the Rental Commencement Date shall be postponed for the number of days beyond forty-five (45) days, that the permits and governmental approvals are delayed; but, in all events, Tenant may terminate this Lease upon written notice to Landlord, without any liability to Landlord, if, due to any action or inaction by Landlord, such permits or governmental approvals are not issued within one hundred eighty (180) days of the Effective Date.  Tenant also shall make a good faith effort to cause the issuance of any required Certificates of Occupancy or final Certificates of Compliance as soon as is reasonably practicable.  Tenant shall execute a certificate acknowledging its having obtained the permits needed for Tenant's Improvements and Tenant's Uses.

2.3   OPTION TO EXTEND.  Tenant shall have the right to extend the term of this Lease for one (1) Option Term upon the following terms and conditions:

(a)   Such extension shall be upon the same terms, covenants and conditions as in this Lease, provided, however, that the Basic Rent shall be as set forth in Section 3.2 hereof; and

16

(b)   Tenant may exercise the Option Term by sending a written notice to Landlord at least one hundred and twenty (120) days prior to the expiration of the Initial Term.

### 3.  RENT

3.1  BASIC RENT. Tenant shall pay as Basic Rent for the Premises the following annual sums during the Initial Term of this Lease, in equal monthly installments, payable in advance on the first day of each calendar month beginning with the Rental Commencement Date:

| LEASE YEARS | BASIC RENT | MONTHLY INSTALLMENT |
|---|---|---|
| 1 ... 3 | $ 97,125.00 | $ 8,093.75 .35 |
| 4 | $100,524.38 | $ 8,377.03 .3623 |
| 5 | $104,042.73 | $ 8,670.23 .3749 |
| 6 | $107,684.22 | $ 8,973.69 .3881 |
| 7 | $111,453.17 | $ 9,287.76 .4016 |
| 8 | $115,354.03 | $ 9,613.84 .4157 |
| 9 | $119,391.42 | $ 9,949.29 .4302 |
| 10 | $123,570.12 | $10,297.51 .4453 |
| 11 | $127,895.08 | $10,657.92 .4609 |
| 12 | $132,371.41 | $11,030.95 .4770 |
| 13 | $137,004.40 | $11,417.03 .4937 |
| 14 | $141,799.56 | $11,816.63 .5110 |
| 15 | $146,762.54 | $12,230.21 .5289 |

The above Basic Rent is calculated using a Four and 20/100 Dollars ($4.20) per square foot per annum rent during Lease Years one (1) through three (3), with an annual three and one-half percent (3 1/2%) increase in the Basic Rent thereafter. In the event of adjustment of the Area of the Premises, as described in Section 1.2(c) above, the Basic Rent for all Lease Years shall be reduced based upon such adjusted Area.

3.2  RENT DURING OPTION TERM. Tenant shall pay Basic Rent for the Premises during the Option Term as described below, which sums shall be payable in equal monthly installments. During the Option Term, the Basic Rent (subject to the adjustments described in Section 1.2(c) above) shall be as follows:

17

| OPTION TERM | BASIC RENT | | MONTHLY INSTALLMENT | |
|---|---|---|---|---|
| Year 1 | $151,899.23 | 6,5686 | $12,658.27 | ,5665 |
| Year 2 | $157,215.70 | 6,7985 | $13,101.31 | ,5665 |
| Year 3 | $162,718.25 | 7,0365 | $13,559.85 | ,5844 |
| Year 4 | $168,413.39 | 7,2827 | $14,034.45 | ,6069 |
| Year 5 | $174,307.86 | 7,5376 | $14,525.65 | ,6281 |

   3.3   PLACE TO PAY RENT.  Tenant shall pay Rent to Landlord in
lawful money of the United States of America at such place as
Landlord, from time to time, may designate in writing to Tenant.
In the absence of such designation, Rent shall be paid at
Landlord's address described in Section 16.1 below.

   3.4   NET LEASE.  Except as herein otherwise provided, it is
the purpose and intent of Landlord and Tenant that this be a net
lease.   Rent shall, except as herein otherwise provided, be
absolutely net to Landlord.  However, nothing contained herein
shall be construed to require Tenant to pay the principal of or
interest on any indebtedness secured by any mortgage or other
indebtedness of Landlord, or to pay any of Landlord's other
obligations described herein.

### 4.   ADDITIONAL RENT

   Tenant shall pay Landlord Additional Rent during the Lease
Term.  The obligation of Tenant described below in this Article 4
for the payment of Additional Rent is only with respect to the
Premises.

   4.1   TAXES.  For each Lease Year, Tenant shall pay all Taxes
attributable to the Premises.  Said amount shall be included in the
Operating Costs to be paid by Tenant as set forth in Section 4.5(b)
below.

   4.2   TAX REFUND.  Tenant, at its option (a) shall receive and
retain its Proportionate Share of any refund obtained by reason of
a reduction in the assessed valuation of the Shopping Center or tax
rate in effect during any Lease Year, or (b) receive a credit equal
to its Proportionate Share of any refund obtained by reason of a
reduction in the assessed valuation of the Shopping Center or tax
rate in effect during any Lease Year, which credit shall be applied
to the next due payments of Additional Rent until the full amount
of such credit shall have been utilized.

   4.3   TENANT'S RIGHT TO CONTEST REAL PROPERTY AND OTHER TAXES.
Tenant, in its sole discretion and at its cost, shall have the

18

right, at any time, to seek a reduction in the assessed valuation of the Premises, or its property, or the Shopping Center or to contest any Taxes that are to be paid, in whole or in part, directly or indirectly, by Tenant.  If Tenant seeks a reduction or so contests, the failure on Tenant's part to pay its Proportionate Share of the Taxes shall not constitute a default as long as Tenant complies with the provisions of the applicable statutes governing tax appeals.  Landlord shall not be required to join in any proceeding or contest brought by Tenant unless the provisions of an applicable law require that the proceeding or contest be brought by or in the name of Landlord or an owner of the Premises.  In that case, Landlord shall join the proceeding or contest, or permit it to be brought in Landlord's name, as long as Landlord is not required to bear any cost.  Tenant, on final determination of the proceedings or contest, shall pay or discharge as soon as may be practicable, any decision or judgment rendered, together with all costs, charges, interest, and penalties incidental to the decision or judgment.

4.4  UTILITY CHARGES.  Tenant shall pay all charges for gas, electric, water, sewer, telephone and other utility services used in or supplied to the Premises.  Tenant shall apply for all water, gas and electric permits and meter use, none of which shall impose any initial hook-up cost or charge upon or to Tenant.  In no event shall Landlord be liable for any interruption or failure in the supply of any utility to the Premises, except if such interruption is caused through the act or negligence of Landlord, its employees, agents, representatives, contractors or subcontractors.  Tenant shall pay its utility charges directly to other the utility companies.

4.5  MAINTENANCE CHARGES AND OTHER OPERATING COSTS.

(a)  Tenant shall maintain the Premises in good, clean, operating condition and shall pay for all costs of operating, repairing, lighting, cleaning, maintaining, securing and managing the Premises.  Tenant shall also pay its Proportionate Share of all Operating Costs.  Notwithstanding anything in the contrary set forth in this Lease, Tenant shall not be responsible for and shall not be obligated to pay any amounts relating to any special assessments or other charges for the maintenance or repair to any other building in the Shopping Center.

(b)  Tenant's Proportionate Share of Operating Costs shall be computed by multiplying Operating Costs by Tenant's Proportionate Share.  Tenant's present Proportionate Share is forty-nine and 72/100 percent (49.72%) subject to adjustment after measurement as described in Section 1.2 above.  Tenant's Proportionate Share of all Operating Costs during the Lease Term shall be paid in monthly installments on or before the first day of each calendar month during the Lease Term, in advance, in an amount estimated in writing by Landlord, such estimates to be reasonable and not to

19

exceed one hundred percent (100%) of the previous year's expenses. Upon receipt of all bills attributable to any calendar year during the Lease Term, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Proportionate Share of Operating Costs for such year, in sufficient detail to determine the items included and the manner of computation. If the total amount paid by Tenant under this Section for any calendar year during the Lease Term shall be less than the actual amount due from Tenant for such year as shown on such statement, Tenant shall pay to Landlord the difference between the amount paid by Tenant and the actual amount due, such deficiency to be paid within ten (10) days after demand therefor by Landlord; and if the total amount paid by Tenant hereunder for any such calendar year shall exceed such actual amount due from Tenant for such calendar year, such excess shall be credited against payments hereunder next due, or, if no payments are next due, refunded by Landlord within ten (10) days after demand therefore by Tenant. All amounts due hereunder shall be payable in the manner and at such place as the Basic Rent payments provided for herein. Landlord's and Tenant's obligations under this Article shall survive the expiration of the Lease Term.

(c) Tenant shall have the right to audit or have audited the Operating Costs, bookkeeping and calculation of Landlord's charges to Tenant. In the event Tenant's audit discloses discrepancies, the appropriate adjustments shall be made and if such discrepancies are in excess of three percent (3%) of the annual billing to Tenant for such charges, Landlord shall also reimburse Tenant its actual out-of-pocket costs of such audit.

## 5. CONSTRUCTION

5.1 **TENANT'S IMPROVEMENTS.** Tenant shall cause the Tenant's Improvements to be constructed within the Premises.

To facilitate construction of the Tenant's Improvements, Landlord shall permit Tenant to use the area marked "Construction Staging Area" set forth on Exhibit B, at no additional charge to Tenant.

5.2 **PLANS AND SPECIFICATIONS.** Tenant, at its expense, shall, within ninety (90) days from the Effective Date, prepare and submit to Landlord for its approval (which approval shall not be unreasonably withheld or delayed) preliminary plans and specifications for the Tenant's Improvements. In the event Landlord fails to object to such plans and specifications within five (5) days after such plans and specifications have been provided to Landlord, silence being deemed approval, those plans and specifications shall be deemed approved. The plans and specifications when approved shall be attached hereto and herein incorporated by reference as Exhibit E.

20

5.3   TIME OF COMPLETION.   Tenant shall proceed promptly and diligently with the construction of the Tenant's Improvements in substantial accordance with the agreed plans and specifications attached as Exhibit E to this Lease.   The Tenant's Improvements, when completed, shall be constructed so as to comply with all applicable laws, ordinances, rules, orders and regulations of the governmental authorities having jurisdiction thereof.

5.4   LANDLORD'S RIGHT OF INSPECTION.   Landlord shall have the right during the construction of the Tenant's Improvements and during normal business hours through its designated representatives, including Landlord's architect and its mortgagee's architect, to inspect the construction or the character of the workmanship and the materials being used in the construction of the Tenant's Improvements, provided, however, that such inspection shall not unreasonably interfere with such construction.

5.5   LANDLORD'S DELIVERY OF THE PREMISES.   Except for its mortgage loan, during the term of this Lease, Landlord will not create or permit to be created or to remain, and will discharge immediately, any lien (including, but not limited to, the liens of mechanics, laborers or materialmen for work or materials, alleged to be done or furnished by Landlord in connection with the Premises), encumbrance or other charges upon the Premises or any part thereof or upon Tenant's leasehold estate. If any such lien, encumbrance or charge shall at any time be filed, Landlord shall forthwith cause the same to be discharged of record by payment. If Landlord shall fail to cause such lien, encumbrance or charge to be discharged within ten (10) days after being notified of the filing thereof and before judgement or sale thereunder, and such lien, in the reasonable opinion of Tenant affects, diminishes or interferes with Tenant's operation of its business or right to quiet enjoyment described in Section 6.1 below, then, in addition to any other right or remedy, at law and in equity, available to Tenant, Tenant may, in its sole and absolute discretion:

(a)   make such payment as is necessary to discharge such lien, encumbrance or charge to be discharged and offset such payments, and all costs incurred by Tenant relating to such discharge, from its next installment(s) of Rent, plus a charge of fifteen percent (15%) of the amount of such payments; or

(b)   terminate this Lease with no further obligations due to Landlord and receive from Landlord the amount of Tenant's Improvements.

5.6   FORCE MAJEURE.   In the event either Landlord or Tenant shall be delayed in the performance of any act required in this Lease by reason of Force Majeure, then performance of such act including, without limitation, the Rental Commencement Date, shall

21

be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, Tenant's obligation to pay Rent once Tenant has commenced paying Rent shall not be excused for reasons of Force Majeure. This provision shall not affect Tenant's termination rights hereunder for untimely issuance or non-issuance of permits, governmental approvals and certificates of occupancy as described in Section 2.2 above.

## 6. USE OF THE PREMISES

6.1   QUIET ENJOYMENT.   Tenant, upon paying the Rent and all other amounts herein provided, and upon performing all of its obligations under the Lease, shall be entitled to lawfully occupy and quietly enjoy the Premises during the Lease Term, including, without limitation, the Common Areas, and the Parking Areas (total, unrestricted parking availability being essential to Tenant's business and a primary consideration for Tenant entering into this Lease). Landlord shall defend Tenant's quiet enjoyment of the Premises against all adverse claims.

6.2   COMPLIANCE WITH LAWS.   Tenant, at its expense, shall promptly comply with all applicable laws and ordinances and all applicable requirements of the various governmental departments and subdivisions having jurisdiction over the operation of Tenant's Uses. Tenant shall observe and comply with the requirement of Tenant's policies of insurance at any time in force with respect to the Premises. Landlord, at its expense, shall also promptly comply with all applicable laws and ordinances and all applicable requirements of the various governmental departments and subdivisions having jurisdiction over the Shopping Center and those parts of the Premises for which Landlord has responsibility hereunder. Landlord shall also observe and comply with the requirements of Landlord's policies of insurance at any time in force with respect to the Shopping Center, including, without limitation, those portions of the Premises for which Landlord has responsibility hereunder.

6.3   TENANT'S MAINTENANCE OF PREMISES.   Tenant shall maintain the Premises, the roof, exterior walls (other than the foundation and structural members of the Premises), utilities, HVAC, electrical, water and sewer at the Premises, and will keep it in a clean, presentable and safe condition. Upon expiration of this Lease, Tenant will surrender the Premises in the same condition as at the commencement of the Lease Term, except for the Tenant's Improvements and Alteration Work during the Lease Term hereof, except for ordinary wear and tear and except for loss caused by fire or any other casualty.

6.4   EXTERIOR SIGNS. Tenant shall have the right to alter and use the existing pylon sign on Marbach Road and the monument signs on Marbach Road and Cable Ranch Road for the purpose of advertising

its business. Tenant shall also have the right to attach its signs to the front and rear exterior of the Premises. Upon the termination of this Lease any defacement or damage to the Premises by such signs shall be repaired by Tenant. Attached hereto as Exhibit F is the Sign Plan for the Premises (indicating the design and location of Tenant's signs), which is hereby approved by Landlord. If said Exhibit F does not include all possible signs which Tenant may install, Tenant shall be entitled to place additional signs on the building sign band for the Premises, if any, and at such other locations as other tenants of the Shopping Center display their respective signs, all of which shall be of no less than equal prominence with other tenants' signs sharing or utilizing such space, including, without limitation, Blockbuster Video. All such additional exterior signs and their location must be approved by Landlord prior to their erection and installation, which approval shall not be unreasonably withheld or delayed and must be erected in conformity with city ordinances and other governmental agency requirements. Notwithstanding anything to the contrary provided herein, Landlord, during the Lease Term, shall not alter the position, dimensions, visibility or prominence of Tenant's signage in the Shopping Center relative to other tenants.

## 7. INSURANCE

7.1   TENANT'S INSURANCE.   From and after the Effective Date, Tenant agrees, during the term hereof, to carry insurance with respect to the Premises against fire, vandalism, malicious mischief and such other perils as are included, from time to time, in a standard extended coverage or "all risk" policy insuring one hundred percent (100%) of the replacement value of Tenant's Improvements. If Tenant fails to maintain such insurance, then Landlord shall be entitled to purchase such insurance on behalf of Tenant. Tenant agrees to reimburse Landlord for one-hundred percent (100%) of such purchased insurance within ten (10) days of written notice to Tenant. In no event shall Tenant's share of such cost exceed Tenant's total cost had Tenant obtained such insurance.

7.2   PROPERTY AND LIABILITY INSURANCE.   (a)   From and after the Effective Date, and at all times thereafter during the Lease Term, Landlord shall maintain and pay for, with reputable insurance companies with a Best's rating of A-12, fire and extended coverage insurance, insuring the Shopping Center, its tenants and users, including, without limitation, the Premises, which insurance shall include all perils customarily encompassed within the meaning of that term in insurance policies from time to time sold in Texas. The initial fire and extended coverage insurance for the Premises shall be for one-hundred percent (100%) of its replacement value of the Premises, shall provide for payment of losses on a "replacement cost" basis and shall not provide coverage on the Premises of less than Eight Hundred Thousand and No/100 Dollars ($800,000.00).

23

Landlord shall not be required to insure Tenant's equipment, trade fixtures, removables or Tenant's Improvements.

(b)   In addition to the property insurance described in paragraph (a) above, Landlord, at all times during the Lease Term, shall maintain, at Landlord's expense, such liability insurance for the Shopping Center, including, without limitation, the Common Areas, the Parking Areas and the exterior of the Premises, in such amounts and pursuant to such terms as are required of Tenant pursuant to Section 7.3. below.

(c)   Landlord shall furnish Tenant with standard certificates for its insurance pursuant to this Section 7.2, similar to the certificates required from Tenant pursuant to Section 7.4 below, naming Tenant as an additional insured.  The policies described herein shall be renewed and new certificates deposited with Tenant at least ten (10) days prior to the expiration of each old policy.

(d)   Tenant's Proportionate Share of all reasonable insurance premiums paid by Landlord for the insurance coverage provided in this Section 7.2 shall be included as Operating Costs.

7.3   **LIABILITY INSURANCE.**  From and after the Effective Date, and at all times thereafter during the Lease Term, Tenant shall insure itself and Landlord, as an additional insured, by maintaining at its expense, public liability and property damage insurance against claims for personal injury, death or property damage resulting from or in connection with Tenant's use or occupancy of the Premises, including the Parking Areas.  Such insurance shall be subject to a deductible amount of Two Hundred and Fifty Thousand and No/100 ($250,000.00), shall name Tenant as loss payee and shall afford the following coverages in the following amounts:

(a)   Not less than One Million and No/100 Dollars ($1,000,000.00) for bodily injury, or death to a single person;

(b)   Not less than One Million and No/100 Dollars ($1,000,000.00) for injury or death as a result of any one occurrence;

(c)   Not less than One Million and No/100 Dollars ($1,000,000.00) for damage to property of third parties as a result of any one occurrence during the term of the policy; and

(d)   An umbrella policy of not less than One Million and No/100 Dollars ($1,000,000.00).

24

This public liability insurance may be provided by including Landlord as an additional insured under the comprehensive general liability insurance blanket policy carried by Tenant.

7.4   LANDLORD AS ADDITIONAL INSURED.  Each policy of insurance obtained by Tenant pursuant to this Article shall name Landlord as an additional insured and shall provide, to the extent obtainable, that cancellation shall require ten (10) days' written notice to Landlord.  If reasonably obtainable, each such policy shall also provide that it shall not be invalid because of an act of negligence on the part of either Landlord or Tenant.  A certificate evidencing the policy shall be promptly delivered to Landlord prior to the Rental Commencement Date.  The policy shall be renewed and a new certificate deposited with Landlord at least ten (10) days prior to the expiration of the old policy.

7.5   PRORATION OF INSURANCE PREMIUMS.  If this Lease begins or ends during any period for which insurance premiums are fully paid by Landlord, then the premiums shall be prorated between Landlord and Tenant in proportion of the number of days each is entitled to possession of the Premises.

7.6   WAIVER OF SUBROGATION.  The parties hereby release each other, and their respective authorized representatives, from any claims for damage to any person or to the Premises, to the Shopping Center or to the fixtures, personal property, the Tenant's Improvements, or alterations of either Landlord or Tenant in or on the Premises, that are caused by, or result from risks insured against under any insurance in force at the time, and to cause each insurance company to waive subrogation against either party covered by any policy.  Landlord's insurance coverage shall waive subrogation against Tenant, and Tenant's insurance coverage shall waive subrogation against Landlord.

## 8.   REPAIRS AND ALTERATIONS

8.1   MAINTENANCE AND REPAIRS.  (a)  During the Lease Term, Tenant shall maintain, pay for and make all needed repairs to the Premises, roof, exterior walls (other than the foundation and structural members of the Premises), utilities, HVAC, electrical, water and sewer at the Premises.  Landlord shall maintain, pay for and make all repairs to the foundation and structural members of the Premises, all Common Areas of the Shopping Center, including, without limitation, the Parking Areas, and in particular, without limiting the generality of the foregoing, all in compliance with ADA.  Notwithstanding anything to the contrary set forth above, Landlord shall have no obligation to make any repairs that it would otherwise be obligated to make for damage caused by any act of negligence on the part of Tenant, its agents and its employees.

25

(b)   Tenant covenants that upon expiration of the Lease Term, Tenant shall surrender the Premises in the same condition as at the commencement of the Lease Term, except for the Tenant's Improvements and Alteration Work during the Lease Term hereof, except for ordinary wear and tear and except for loss caused by fire or any other casualty.

Tenant shall keep the Premises in a clean, tenantable condition. Tenant shall not permit any garbage, rubbish, refuse or unreasonable quantities of dirt to accumulate in or about the Premises. Tenant shall maintain the interior of the Premises in compliance with ADA.

8.2   ALTERATIONS.   During the term of the Lease, Tenant may, at its own expense perform Alteration Work, subject to Landlord's approval if required pursuant to Section 8.4 below. Any Alteration Work of the Premises shall not injure or adversely affect the Premises. During any Alteration Work, Tenant shall carry "Builder's Risk" insurance, naming Landlord as an additional insured, in commercially reasonable amounts. The Alteration Work shall conform in material and workmanship to that of the Premises and be performed in a good and workmanlike manner.   All Alteration Work shall become a part of the Premises.   Alteration Work requiring building permits shall be performed pursuant to plans prepared by a duly licensed architect or engineer selected by Tenant.

8.3   WORK COSTING LESS THAN ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00).   In each case where Tenant reasonably estimates that the cost of the Alteration Work will be less than One Hundred Thousand and No/100 Dollars ($100,000.00), Tenant shall complete the Alteration Work promptly and in conformity with the standards set forth in this Article, all without notice to or approval from Landlord.

8.4   WORK COSTING ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) OR MORE.   In each case where Tenant reasonably estimates that the cost of the Alteration Work will be One Hundred Thousand and No/100 Dollars ($100,000.00) or more, Tenant shall give Landlord for its approval, which approval shall not be unreasonably withheld or delayed, written notice of its intention to perform the Alteration Work, together with the plans and specifications describing the Alteration Work.   If Landlord does not respond to Tenant's request for approval of plans and specifications within seven (7) days of their receipt (silence being deemed approval), then the plans and specifications shall be deemed approved.   Tenant may employ any reputable contractor to perform the Alteration Work.   Tenant shall proceed to cause the Alteration Work to be performed in accordance with the approved plans and specifications.   To confirm that the Alteration Work is progressing in substantial accordance with the approved plans and specifications, Landlord shall have the right to enter the Premises during normal business hours and shall not interfere either with

26

Tenant's normal operation of its business or the performance of the Alteration Work.

8.5  **WORK TO COMPLY WITH LAWS.**  All Alteration Work performed pursuant to this Article shall be done pursuant to validly issued permits, if necessary, and in conformity with all applicable laws and ordinances. Tenant shall, upon reasonable request, give Landlord copies of all such permits (including occupancy permits) within ten (10) days after Tenant receives them.

8.6  **MECHANICS' LIENS.**  Subject to the remaining part of this Section, Tenant shall not permit any mechanic's or materialmen's liens ("mechanics' liens") to be recorded against the Premises by reason of the Alteration Work.  For Alteration Work that Tenant reasonably estimates that the cost thereof will exceed One Hundred Thousand and No/100 Dollars ($100,000.00), Tenant shall provide Landlord with copies of all lien waivers and releases, in such form as shall be reasonably satisfactory to Landlord, from all contractors performing such Alteration Work or, supplying materials in connection therewith.  However, Tenant shall not be required to pay or discharge any such mechanic's liens if, within thirty (30) days of the recording of the same, Tenant commences and thereafter proceeds diligently, in good faith, to contest said lien by appropriate proceedings.  Before Tenant commences such contest, it shall, upon reasonable request, provide Landlord with (a) a bond equal to the amount of the lien or in such amount as is required under applicable law, or (b) if available, title insurance, insuring Landlord against any defect in Landlord's title resulting from any such mechanics' liens.

## 9.  DAMAGE OR DESTRUCTION

9.1  **RESTORATION AFTER DAMAGE OR DESTRUCTION.**

(a)  In the event the Premises are damaged or destroyed by fire or other casualty, in whole or in part, at any time during the Lease Term, Tenant shall forthwith give Landlord written notice of such damage or destruction.  Except as provided in paragraph (d) below and subject to the provisions of Section 9.5 below, Landlord must and shall proceed promptly to restore the Premises to the condition they were in immediately prior to such damage or destruction, unless otherwise excused by Section 9.5 below, provided, that, unless such damage or destruction is due to any act or negligence of Landlord, in no event shall Landlord be required to restore, repair or replace Tenant's furniture, trade fixtures and equipment, and Tenant's Improvements or Alteration Work.

(b)  In the event Landlord fails to repair and restore the Premises as required in paragraph (a) above, Tenant shall be entitled to have the same done and paid for by Landlord or, if Landlord fails to immediately pay Tenant for such work upon demand

27

by Tenant, Tenant shall have the right to set-off against the Rent next due and owing the amount expended by Tenant for such repair and restoration, plus fifteen percent (15%), per annum, thereof, all without further notice to and cure period of Landlord.

(c)   There shall be abatement of Rent during Restoration Work to the extent of one hundred percent (100%) if the Premises are totally destroyed. In the case of less than total destruction, Rent shall be abated (i) if the use of the Premises as a health club as it was prior to the casualty is not materially impaired, in the proportion that the unusable area of the Premises, as reasonably determined by Tenant's architects or engineers, bears to the total area of the Premises as described in Section 1.2 above; or (ii) if the use of the Premises as a health club as it was prior to the casualty is materially impaired, in the proportion that the use as a health club has been so impaired.

Abatement shall be for the period from the date of such damage or destruction to (i) the date of substantial completion of the Restoration Work; or (ii) if the Shopping Center and not the Premises is so damaged or destroyed, the date on which the Premises shall be made accessible and/or tenantable.

(d)   Landlord shall assign to Tenant, and cause any co-insured in Landlord's stead, if applicable, to assign to Tenant, immediately upon receipt of the same, all Insurance Proceeds pertaining to the Premises from policies which named Landlord as additional insured.   Provided Tenant has received such Insurance Proceeds pertaining to the Premises and further provided that Landlord's restoration and repairs described in paragraph (a) above have been completed, promptly thereafter, Tenant shall, at Tenant's expense, perform any Restoration Work required to restore, repair or replace its trade fixtures and equipment, furniture Tenant's Improvements and Alteration Work to the condition they were in immediately prior to such damage or destruction.

9.2   TENANT TO SUBMIT PLANS FOR RESTORATION WITHIN NINETY (90) DAYS.   In the event Tenant is obligated to commence Restoration Work pursuant to Section 9.1(d) above and Tenant reasonably estimates that the cost of such restoration will be One Hundred Thousand and No/100 Dollars ($100,000.00) or more, it shall submit to Landlord within ninety (90) days from the date of the damage to or destruction of the Premises, for Landlord's approval, (which approval shall not be unreasonably withheld or delayed) plans and specifications for such Restoration Work.   In the event Landlord fails to object to such plans and specifications within fourteen (14) days after such plans and specifications have been delivered to Landlord (silence being deemed approval), those plans and specifications shall be deemed approved.   Such plans and specifications may include such modifications of, or additions to the Premises as Tenant may desire, subject to Landlord's approval as provided above.   Once such plans and specifications are

28

approved, subject to Tenant's obligations described in Section 9.1(d) above, Tenant shall proceed diligently to complete the Restoration Work in the manner provided in Article 8.

9.3   **PAYMENT FOR RESTORATION.**   The Insurance Proceeds available after Landlord has completed its restoration described in Section 9.1(a) above, shall be used to pay for the Restoration Work done pursuant to this Article.   All amounts paid for the Restoration Work shall be disbursed as provided in Sections 9.1(d) above and 9.4 below.

9.4   **DISPOSITION OF EXCESS INSURANCE PROCEEDS.**   In the event the Restoration Work costs less than the amount of the Insurance Proceeds, the balance of the Insurance Proceeds in excess of the amount of the Restoration Work shall be retained by the party from whose insurance such excess proceeds were paid.

9.5   **RESTORATION NEAR END OF TERM.**   If, within thirty-six (36) months of the expiration of the Initial Term of this Lease or within twenty-four (24) months of the expiration of the Option Term hereof, the Premises are damaged or destroyed to such an extent as to render them untenantable or otherwise unrepairable within sixty (60) days from the date of such damage or destruction, then at either party's option, this Lease shall terminate and be deemed retroactively terminated as of the date of damage or destruction.   Within sixty (60) days following such damage or destruction, either Tenant or Landlord shall give the other party written notice of its election to terminate this Lease as provided in this Section 9.5., which election shall be deemed effective as of the date of such damage or destruction.   In the event of termination under this Section, all Rent shall be prorated to the date of such damage or destruction and all Insurance Proceeds shall be retained by the party from whose insurance policies said Insurance Proceeds are attributable.

## 10.   ASSIGNMENTS AND SUBLEASES

10.1   **ASSIGNMENT TO AFFILIATE.**   Tenant may assign this Lease or sublet the entire Premises, without the consent of Landlord, on the same terms and conditions contained herein, to any corporation, directly or indirectly controlled by Tenant, its shareholders or by any corporation which any of its shareholders, directly or indirectly control, to any affiliate corporation or to any entity which purchases substantially all of the assets of Tenant, but no such assignment or sublease shall relieve Tenant of any liability hereunder.   An affiliate corporation is any corporation controlled by any corporation or natural person directly or indirectly controlling the Tenant, its shareholders or any corporation directly or indirectly controlled by them.   For purposes of this Section, "control" shall mean the possession of the power to direct or cause the direction of the management and policies of any

29

corporation, whether through ownership, voting securities, contract, trust or otherwise. Tenant may, without landlord's consent, license or contract with concessionaires or licensees to operate portions of its business within the Premises, such as juice bar, physical therapy, etc.

10.2 ASSIGNMENT OR SUBLETTING. If Tenant wishes to assign or to sublet the Premises, then Tenant must obtain the prior written consent of Landlord which consent shall not be unreasonably withheld or delayed. Landlord's consent shall be given if Basic Rent is no lower and all other terms and conditions of the Lease are required to be met, and the subtenant has a good credit standing and will use the Premises in substantially the same manner as Tenant and for substantially the same types of uses as Tenant's Uses. Provided that Tenant is released from and relieved of any liability under this Lease, Landlord shall be entitled to receive the excess of the amounts of payments (as rent or otherwise) to be paid by any such assignee or sub-tenant in excess of the amounts Tenant is obligated to pay hereunder.

10.3 CONSENT OF LANDLORD TO ASSIGNMENTS OR SUBLEASES. If Tenant seeks Landlord's consent to a proposed assignment or sublease, Tenant shall give Landlord a copy of the prospective assignment or sublease, together with a written request for Landlord's consent. Within ten (10) days after receiving such request, with the assignment or sublease attached, Landlord shall give Tenant a written notice, (a) approving the assignment or sublease, or (b) withholding approval of the assignment or sublease. If Landlord fails to respond within the designated time, then the proposed assignment or sublease shall be deemed approved.

## 11. INDEMNIFICATION

11.1 INDEMNIFICATION OF LANDLORD. Tenant hereby agrees to indemnify and hold harmless Landlord from and against all claims, from time to time, asserted by any person (including, without limitation, Tenant's agents, contractors, employees, licensees and representatives) arising from:

(a) Any work or other thing done in or about the Premises undertaken by Tenant, or by Tenant's contractors, employees, agents, licensees or representatives;

(b) Any condition in the Premises (other than those conditions or areas for which Landlord is responsible under this Lease);

(c) Any material default by Tenant in the performance of any material obligation of

30

Tenant hereunder, provided Landlord is not in default under this Lease;

(d)   Any willful misconduct or negligence of Tenant or any of its agents, contractors, employees, representatives or licensees; and

(e)   Any accident, injury or damage whatsoever caused to any person occurring in the Premises.

However, Tenant does not indemnify Landlord against any claim based upon, or in any way caused by the negligence or willful misconduct of Landlord or its agents, contractors, employees, licensees or representatives. Tenant does not indemnify Landlord against any claims or damages arising out of any injury to or death of a person or property damage resulting from the type of risk covered by a public liability or property damage insurance policy in which the Landlord is an insured party, or for injury to or death of any person or damage to property resulting from the use or intended use of the Common Areas or the Parking Areas.

11.2  PAYMENT OF LITIGATION EXPENSES.  In the event any action or proceeding is brought against Landlord by reason of any claim against which Landlord is indemnified by Tenant pursuant to Section 11.1 above, Tenant shall, upon receiving a written request from Landlord, defend Landlord in such action or proceeding, at Tenant's expense.

11.3  INDEMNIFICATION OF TENANT.  Landlord agrees to indemnify and hold harmless Tenant from and against all claims, from time to time, asserted by any person (including, without limitation, Landlord's agents, contractors, employees, licensees and representatives) arising from:

(a)   Any work or other thing done in or about the Shopping Center, including, without limitation, the Premises, the Parking Areas and the Common Areas, undertaken by Landlord, its agents, contractors, employees, licensees or representatives;

(b)   Any condition within the Shopping Center, including, without limitation, the Premises, the Parking Areas and the Common Areas, other than those directly created by Tenant within the Premises;

(c)   Any material default by Landlord in the performance of any material obligation of Landlord hereunder, provided Tenant is not in default under this Lease; and

31

(d) Any willful misconduct or negligence of Landlord or any of its agents, contractors, employees, representatives or licensees.

11.4 **PAYMENT OF LITIGATION EXPENSES.** In the event any action or proceeding is brought against Tenant by reason of any claim against which Tenant is indemnified by Landlord pursuant to Section 11.3 above, Landlord shall, upon receiving a written request from Tenant, defend Tenant in such action or proceeding, at Landlord's expense.

## 12. DEFAULT BY TENANT OR LANDLORD

12.1 **DEFAULT IN PAYMENT OF RENT.** If Tenant fails to make payment of Basic Rent or Additional Rent when due, and such failure continues for ten (10) days after Tenant receives written notice thereof from Landlord, then such failure to pay shall be a default under this Lease.

12.2 **NON-MONETARY DEFAULTS.** If Tenant fails to perform any covenant of this Lease (other than the covenant to make payment of Basic Rent or Additional Rent) for a period of thirty (30) days after Tenant receives written notice thereof from Landlord specifying the nature of such failure, then such failure shall be deemed a default under this Lease. However, if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion, provided, however, that regardless of whether or not Tenant is diligently prosecuting such cure, if Tenant fails to perform any such covenant of the Lease for a period of one hundred twenty (120) days after Tenant receives such written notice, then such failure shall be deemed a default under this Lease.

12.3 **FINANCIAL DEFAULTS.** If during the term of this Lease:

(a) A voluntary or involuntary petition in bankruptcy shall be filed by or against Tenant which attempts to modify Tenant's obligations under this Lease; or

(b) Tenant shall enter into any formal arrangement with its creditors as a class extending the time within which Tenant may pay any of its obligations and which attempts to modify Tenant's obligations under this Lease; or

(c) Tenant shall effect any composition which materially alters Tenant's obligations to pay Rent under this Lease; or

32

(d) Tenant shall make any assignment for the benefit of its creditors; or

(e) All or any part of interest of Tenant in the Premises shall be levied upon under execution to satisfy all or part of a judgment entered by a court of competent jurisdiction or shall be levied upon or distrained to pay all or part of any governmental tax or shall be the subject matter of a receivership proceeding or trusteeship, then

Landlord shall give Tenant written notice stating that a default has occurred and specifying the nature of that default and Tenant shall have sixty (60) days after Landlord gives Tenant such notice to present to Landlord, evidence that such default has ceased to exist. This Lease shall terminate on the sixty-first (61st) day after such notice is given by Landlord, unless Tenant shows that the proceedings against it are stayed and/or Tenant has undertaken to diligently and in good faith defend against such proceedings. Under such circumstances, this Lease shall terminate when an order staying the proceeding is dissolved and Tenant does not appeal such dissolution or if Tenant has ceased to defend such action diligently and in good faith or without a result favorable to Tenant.

12.4 LANDLORD'S REMEDIES. (a) If an event of default shall have occurred pursuant to this Article 12, which event has not been cured as provided in Sections 12.1, 12.2 or 12.3 above, as shall be applicable, Landlord shall have the right, at its election, then or any time thereafter while such event of default shall continue, to pursue any one or more of the following remedies after delivery of written notice to Tenant:

(i) Terminate this Lease in which event Tenant shall immediately surrender the Premises to Landlord and if Tenant fails to do so, Landlord, without prejudice to any other remedy which it may have for possession or arrearage in Rent or other amounts hereunder, may enter upon and take possession of the Premises and expel or remove Tenant and any other person or persons who may be occupying the Premises, or any part thereof, by force, if necessary, without being liable for prosecution or any claim of damages therefore and Tenant hereby agrees to pay to Landlord any deficiency

33



that may arise by reason of any reletting of the Premises;

(ii)    Enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and any other person or persons who may be occupying the Premises, or any part hereof, by force, if necessary, including, but not limited to, changing the door locks on the Premises, and without providing Tenant with the new key to the Premises, all without being liable for prosecution or any claim for damages therefor.  Subject to paragraph (b) below, Landlord shall not be responsible or liable for any failure to relet the Premises or any part thereof or for any failure to collect any rent due upon any such reletting other than as set forth herein.  No such re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such termination is executed by Landlord and delivered to Tenant;

(iii)   Enter upon the Premises by force if necessary, including, but not limited to, changing the door locks on the Premises without the necessity of providing written notice to Tenant on the front door of the Premises or otherwise, and without providing Tenant with the new key to the Premises, all without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this Lease and Tenant agrees to reimburse Landlord on demand for any expense which Landlord may incur in thus affecting compliance with Tenant's obligations under this Lease together with interest at the lesser of (A) the maximum interest rate allowed by law or (B) fifteen percent (15%) per

34

annum, and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such action, other than damages caused by the gross negligence or willful misconduct of Landlord or any of its employees, representatives or agents; and/or



(iv)'    Terminate this Lease by giving Tenant written notice thereof, in which event, Tenant shall pay to Landlord all Rent accrued hereunder through the date of termination.

(b)   Landlord shall use its reasonable efforts to mitigate Tenant's damages by using its reasonable efforts to relet the Premises or any part thereof for the account of Tenant, in the name of Tenant or Landlord or otherwise, and Landlord shall be entitled to collect and receive any rents payable by reason of such reletting.

(c)   No repossession or reentering on the Premises or any part thereof pursuant to this Article 12 or otherwise shall relieve Tenant or any guarantor of its liabilities and obligations hereunder, all of which shall survive such repossession or reentering. Notwithstanding any such repossession or reentering on the Premises or any apart thereof by reason of the occurrence of any event of default, Tenant will pay to Landlord the Rent (as modified or otherwise reduced as set forth in this Section 12.4).

(d)   No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy permitted by law or in equity, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given hereunder or now or hereafter existing by agreement or at law or in equity or by statute.

12.5    RIGHTS UPON HOLDING OVER.  Tenant shall surrender the Premises at the end of the Lease Term.  In the event that Tenant shall, for any reason, remain in possession after the expiration of the Lease Term, such possession shall be as a month-to-month tenant during which time Tenant shall pay as Rent the same monthly rental plus fifty percent (50%) of Basic Rent paid by Tenant during the previous Lease Term.

12.6    LANDLORD'S RIGHT TO PERFORM TENANT'S COVENANTS.  If Tenant shall, at any time, be in default in the performance of any act on its part to be performed hereunder, Landlord may (but shall not be obligated to), after giving Tenant thirty (30) days prior written notice, perform any act to be performed or make any payment to be made on the part of Tenant, and may pay any expenses

35

incidental thereto.  All sums so paid by Landlord shall constitute Additional Rent payable on demand.  Failure to make such payment on demand shall constitute a new default by Tenant and Landlord shall have the same rights and remedies as in the case of default by Tenant in the payment of any installment of Rent.  Landlord shall be entitled to all other remedies herein provided, as well as those provided by law and in equity.

12.7   TENANT'S RIGHT TO PERFORM LANDLORD'S COVENANTS.  If Landlord shall, at any time, be in default in the performance of any act on its part to be performed hereunder, Tenant may (but shall not be obligated to), after giving Landlord thirty (30) days prior written notice, perform any act to be performed or make any payment to be made on the part of Landlord, and may pay any expenses incidental thereto.  Tenant shall set-off against the Rent next due and owing the amount expended by Tenant as set forth in this Section, plus fifteen percent (15%) thereof.  Tenant shall be entitled to all other remedies herein provided, as well as those provided by law and in equity.

## 13.  CONDEMNATION

13.1   TOTAL TAKING.  If the entire Premises, or so much of the Premises, the Common Areas or the Parking Areas, or all three, so as to render any or all of them "substantially unusable" by Tenant in the ordinary operation of its business, are appropriated or taken under the power of eminent domain by any public or quasi-public authority, Tenant may, in its sole and absolute discretion, terminate this Lease, as of the date of such taking, upon giving Landlord notice of such election within thirty (30) days after receipt by Tenant from Landlord of written notice of such appropriation or taking. With respect to the Parking Areas, the term "substantially unusable" shall include, but not be limited to, the lesser of (a) an aggregate loss of ten percent (10%) or more of the existing number of parking spaces available to the Shopping Center or (b) such number of parking spaces so that the remaining number of parking spaces available to the Shopping Center or Tenant is less than the number of parking spaces required either for the Shopping Center or the Premises, as the case may be, under applicable ordinance, rule or regulation. The Premises shall be deemed substantially unusable hereunder if the appropriation or taking results in Tenant's inability to use the Premises for Tenant's Uses or otherwise materially affects the operation of Tenant's business.  In the event of such a termination of this Lease, Tenant shall be released from any further liability under this Lease.

13.2   PARTIAL TAKING. If any portion of the Premises, the Common Areas or the Parking Areas, or all three, is condemned or taken by eminent domain proceedings so as to render the Premises less than "substantially unusable," as defined in Section 13.1

36

above, then Tenant may, in its sole and absolute discretion, reduce the Rent proportionately on account of that part of the Premises or the Parking Areas, or both, as the case may be, which is unusable by Tenant.

13.3   RESTORATION.   Upon a partial taking, as described in Section 13.2 above, as expeditiously as possible, Landlord shall restore the Premises, the Common Areas, and the Parking Areas to at least as good condition as they were in immediately prior to such partial taking.  Such restoration shall be performed in the manner described in Section 9.1 above.  The total condemnation award shall be applied to such restoration, with any balance belonging to Landlord, except as provided in Section 13.4 below.  If a partial taking occurs, then the Rent payable hereunder to Landlord shall be reduced as described in Section 13.2 above.

13.4   DISTRIBUTION OF AWARD.   Any condemnation award shall belong to Landlord, except that Tenant shall receive from that award a sum of money equal to the unamortized value of Tenant's Improvements from the Rental Commencement Date through the date of condemnation.   Tenant's Improvements shall be deemed to be amortized equally over the term of the Lease.  In addition, Tenant shall be entitled to claim any separate award made for the value of Tenant's leasehold interest or for Tenant's relocating expenses and loss of goodwill.

### 14.   MORTGAGE OR ENCUMBRANCE OF LEASEHOLD INTEREST

Tenant may not, without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed, mortgage, pledge, or convey a security interest in, or otherwise encumber, the leasehold estate hereby created or any of Tenant's right, title and interest under this Lease.  If so consented to by Landlord, Tenant shall give Landlord written notification of the name and address of such mortgagee, pledgee, security interest holder or encumbrancer.   Thereafter, Landlord agrees that any notice to be served upon Tenant under this Lease shall also be served upon any such third party, and that Landlord shall accept performance by such third party of any obligations of Tenant hereunder.   Any such mortgage, pledge, conveyance or other encumbrance shall be subordinate to this Lease and to any mortgage or deed of trust placed against the Premises by Landlord, but the benefits and burdens of any non-disturbance agreement issued to Tenant shall run to such third party as well.

### 15.   PRIORITY OF LEASE

15.1   LEASE TO BE PRIOR TO ANY ENCUMBRANCE.   Tenant agrees that, subject to Sections 15.2 and 15.3 below, the leasehold estate of Tenant hereby shall, from the date of this Lease to the end of

37

its term including the Option Term, be prior to any existing lien (except for taxes and assessments not yet due and payable), or encumbrance or other leasehold interest created or imposed, or caused or allowed to be imposed, by Landlord upon or against any or all of its interest in the Premises.

15.2    SUBORDINATION AND NON-DISTURBANCE.    Pursuant to the terms of the Subordination, Non-Disturbance and Attornment Agreement (the "Non-Disturbance Agreement") contained in Exhibit A hereto, Tenant agrees that this Lease, shall, upon the request of Landlord, be subordinated to the lien and charge of the purchase money mortgage ("Mortgage") placed upon the Premises, or any part thereof, in connection with the financing by NationsBank of Texas, N.A. ("Lender") for the acquisition of the Shopping Center by Landlord. It shall be a condition precedent to all of Tenant's obligations hereunder that Landlord furnish Tenant within ten (10) days of the Effective Date with an executed Non-Disturbance Agreement in the form attached hereto as Exhibit A from any existing mortgagee(s), trust deed beneficiary(ies) and ground lessor(s) of the Premises, the Common Areas, the Parking Areas and the Shopping Center, including, without limitation, from Lender. Should Landlord fail to so furnish such executed Non-Disturbance Agreement(s) to Tenant, then Tenant at its sole election may (a)(i) terminate this Lease without any obligation to Landlord and (ii) recover from Landlord all of Tenant's costs and expenses, including, without limitation, all reasonable architecture, engineering and legal fees and expenses incurred by Tenant in finding the Premises, designing the Premises and planning Tenant's Improvements, negotiating and documenting this Lease and enforcing or attempting to enforce this Lease; or (b)(i) continue this Lease and do Tenant's Improvements and (ii) avail itself of any and all rights and remedies available to it at law and in equity; and/or (c) seek and obtain injunctive relief forever restraining such breach by Landlord. Said Non-Disturbance Agreement shall contain language, among other things, to the effect that:

(a)    So long as Tenant shall not be in default under this Lease, this Lease shall not be terminated and Tenant's rights and obligations under this Lease shall not be disturbed by any proceedings taken by Lender in the exercise of any of its rights under the mortgage or note secured thereby, or by any deed given in lieu of foreclosure or any other such proceedings. Tenant shall not be named as a party defendant to any foreclosure of the mortgage, or in any other way shall Tenant be deprived of its rights under this Lease; and

(b)    If Lender or any other person in the exercise of any right under the mortgage or by virtue of a deed in lieu of such exercise, becomes

38

the owner of the Premises, such new owner shall be bound by and shall perform all of Landlord's obligations under this Lease. Tenant shall recognize such new owner as the "Landlord" under this Lease as of the date such new owner acquires it ownership interest, and the new owner shall have all the rights granted to Landlord in this Lease including, but not limited to, the right to receive and collect Rent from Tenant, subject to Tenant's rights of set-off and abatement and other rights provided in this Lease.



15.3  EXECUTION OF SUBORDINATION DOCUMENTS.  If Lender agrees to execute and deliver the Non-Disturbance Agreement, (pursuant to Section 15.2 above), then Tenant agrees to execute such further instruments as may be required to subordinate the rights and interest of Tenant under this Lease to the lien and charge of any such mortgage. However, with regard to the subordination by Tenant to any mortgage evidencing any refinancing of the Premises, such subordination shall be required of Tenant only if a Non-Disturbance Agreement is furnished to Tenant and it would not adversely affect Tenant's priority rights with respect to intervening liens, if any, which are recorded after this Lease but prior to the recordation of the mortgage evidencing such refinancing.

## 16.  MISCELLANEOUS

16.1  MANNER OF GIVING NOTICE.  Whenever either party wishes to give any notice, request or document to the other (whether required by this Lease or otherwise), such notice, request or document shall be sent by U.S. registered mail, certified mail or express mail, postage prepaid, overnight delivery service, by hand delivery or by facsimile transmission, in all cases with the original so mailed or delivered to the last address previously specified in writing by the party to whom the written notice is given.  If no other address has been specified, all notices, requests or documents directed to Landlord shall be sent to it as follows:

> PRESIDENT'S SQUARE LIMITED PARTNERSHIP
> 10440 North Central Expressway
> LB 702, Suite 702
> Dallas, Texas  75231-2215
> Attention:  Mr. John L. Cole

All notices, requested or documents directed to Tenant shall be sent to it as follows:

39



DALLAS HEALTH CLUBS, INC.
d/b/a PRESIDENT'S HEALTH CLUBS
13714 Gamma Road
Suite 100
Dallas, Texas 75240
Attn: Area Director

                    and

Dallas Health Clubs, Inc.
c/o Bally's Health & Tennis Corporation
8700 West Bryn Mawr Avenue
Chicago, Illinois 60631
Attn: General Counsel

                    and

Dallas Health Clubs, Inc.
c/o Bally's Health & Tennis Corporation
2029 Century Park East, Suite 2810
Los Angeles, California 90067
Attn: Director of Property Management
      310-552-2441

      Notices, requests and documents given in the manner prescribed
shall constitute sufficient notice of the contents thereof for all
purposes and shall be deemed to have been given upon the first to
occur of (a) when actually received; (b) seventy-two (72) hours
following deposit in U.S. registered mail or certified mail,
postage prepaid, return receipt requested, or (c) forty-eight (48)
hours after delivery to an overnight delivery service.

      16.2  MODIFICATION OF LEASE.  This Lease contains all of the
agreements and representations between the parties.  None of the
terms of the Lease shall be waived or modified to any extent,
except by a written instrument signed and delivered by both
parties.

      16.3  COVENANTS SEVERABLE.  Whenever possible, each provision
of this Lease shall be interpreted in such a manner as to be
effective and valid under applicable state law.  If any provision
of this Lease be prohibited or invalidated under applicable law,
such provision(s) shall only be ineffective to the extent of such
prohibition of invalidity, without invalidating the remaining
provisions of this Lease.

      16.4  PAYMENT UNDER PROTEST.  If, at any time, a dispute shall
arise as to any amount to be paid by the one party to the other
under any provision hereof, the party against whom the obligation
to pay money is asserted shall have the right to make payment
"under protest."  A payment "under protest" shall not be regarded
as voluntary payment, and the payor may institute suit for the
recovery of the payment.  If it shall be adjudged that there was no

                              40

legal obligation on the payor to make such payment or any part thereof, the payor shall be entitled to recover such payment or so much thereof as it was not legally required to pay, together with its reasonable expenses of suit, including reasonable attorneys' fees.

16.5  PERFORMANCE UNDER PROTEST. If, at any time, a dispute shall arise as to any act to be performed by either party under the provisions hereof, the party against whom the obligation to perform is asserted may perform the disputed act and pay the costs thereof "under protest." The performance of such act and the payment of costs "under protest" shall not be regarded as a voluntary performance or payment, and the performer may institute suit for the recovery of the cost of performing such act. If it shall be adjudged that there was no legal obligation on the performer to perform the act or any part thereof, the performer shall be entitled to recover the cost of such acts or the costs of so much thereof as it was not legally required to perform, together with its reasonable costs of suit, including reasonable attorneys' fees.

16.6  SINGULAR AND PLURAL. Any word contained in the text of this Lease shall be read as the singular or plural, or in the masculine, feminine or neuter gender, as may be applicable in the particular context.

16.7  CAPTIONS. The captions of this Lease are for convenience and reference only and in no way limit or expand the scope or intent of this Lease or any Section hereof.

16.8  LANDLORD'S BILLINGS. Landlord's billings and prorations to Tenant shall be supported by photocopies of bills, with copies transmitted to Tenant.

16.9  SHORT FORM LEASE. Tenant and Landlord, upon request of either, agree to execute and deliver a memorandum or so-called "short form" of this Lease in recordable form for the purposes of recordation at Tenant's expense. Said memorandum or short form of this Lease shall describe the parties, the Shopping Center, the Premises and the Lease Term, shall incorporate this Lease by reference and otherwise shall be fully consistent herewith.

16.10  LANDLORD'S ACCESS TO PREMISES. Notwithstanding anything to the contrary contained herein, except as provided in Sections 5.4 and 8.4 above and except for emergencies, Landlord shall only enter the Premises after giving forty-eight (48) hours advance written notice to Tenant, at such reasonable times and in a manner so as not to interfere with Tenant's business, and not more frequently than two (2) times in any calendar month, provided such entry shall not interfere with Tenant's normal operation of its business.

41

16.11   CHOICE OF LAW.   This Lease shall be governed by, and construed in accordance with, the laws of the State of Texas.

16.12   HEIRS AND ASSIGNS.   Except as expressly otherwise provided, all of the terms covenants and conditions hereof shall be binding upon and inure to the benefit of the heirs, personal representatives, successors in interest and permitted assigns of the parties hereto.

16.13   ESTOPPEL CERTIFICATE BY TENANT.   Tenant shall, within ten (10) days after receiving a written request from Landlord, which request shall not be made more frequently that two (2) times per calendar year, make a statement in writing certifying: (a) that the term of this Lease has commenced, setting forth the date of such commencement and termination; (b) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the Lease is in full force and effect, as modified, and stating the modification(s)); (c) whether or not there are then existing any known offsets or defenses against the enforcement of any of Tenant's covenants hereunder ( and, if so, specifying them); (d) the dates to which Basic Rent, Additional Rent and all other amounts to be paid by Tenant hereunder have been paid in advance, if at all; (e) whether or not Tenant has acquired any interest in the Premises except for its interest under this Lease; (f) whether there are any uncured defaults by Landlord, and, if defaults are claimed, stating the facts giving rise thereto; and (g) such other factual statements as may be reasonably requested. Any such statement given by Tenant may be relied upon by Landlord, by a prospective purchaser of the fee simple interest in the Premises, and by any mortgagee, assignee or prospective mortgagee, through the date of the estoppel certificate.

16.14   BROKER.   Landlord represents and warrants that no broker commission shall be due from Tenant hereunder. Tenant represents and warrants that no broker commission shall be due from Landlord hereunder. Landlord shall indemnify and hold Tenant harmless from any claims for brokerage commission, including Tenant's legal fees and court costs.

16.15   EXCLUSIVITY.

(a)   Landlord agrees that during the Lease Term, Landlord will not enter into new leases for space in the Shopping Center, modify existing leases and/or give its consent where its consent is required for any other Shopping Center tenant to use its premises as a health club facility. Notwithstanding anything to the contrary set forth in this Section 16.15, other Shopping Center Tenants shall not be prevented from operating a children's nursery, operating a restaurant or juice bar or conducting retail sales of athletic equipment or clothing.

42

(b)  In the event of a breach of the provisions of this Section 16.15 by Landlord, Tenant shall deliver notice of such breach to Landlord whereby Landlord shall have thirty (30) days after receipt of such notice to cure such breach.  If Landlord fails to cure such breach within said thirty (30) day period, Tenant may, in its sole discretion, (i) terminate this Lease and receive from Landlord the amount of the unamortized cost of Tenant's Improvements amortized in equal annual amounts over the Initial Term, and/or (ii) have all other rights and remedies available to it at law or in equity, including but not limited to, the right of injunction.

16.16  PRE-SALES PREMISES AND TEMPORARY SIGNS.

(a)  From and after the Effective Date, and for the six (6) month period immediately thereafter, Tenant shall occupy, rent-free, the area in the Premises which Tenant may finish, furnish and equip as it sees fit, but without structural changes to the space, at its sole expense, and with respect to which Tenant shall (i) maintain and repair as set forth in this Lease, (ii) provide insurance as set forth in Sections 7.1 and 7.3 above, and (iii) indemnify Landlord as set forth in Section 11.1 above, and from which Tenant may conduct sales of memberships in the health club facility which shall occupy the Premises but for no other purposes. Such space, which is herein referred to as the "Pre-Sales Premises," shall not constitute Tenant's opening for business or taking possession of the Premises for any proposes hereunder.

(b)  From and after the Effective Date and until thirty (30) days after Tenant opens the Premises for business, Tenant shall be entitled to erect or attach one sign on the pylon, one sign on the Marbach Road entrance monuments and one sign on the Cable Ranch entrance monument announcing the forthcoming opening of its club in the Premises.  The erection or attachment of such signs shall be in compliance with all applicable law and the erection or attachment and maintenance thereof shall be at Tenant's sole expense.  If both signs are not permitted by law to Tenant, then Tenant shall be entitled to erect or attach the number of signs that are permitted to it.

16.17  ENVIRONMENTAL MATTERS.  Landlord and Tenant agree that they have not and will not generate, transport, treat, store, dispose, nor, in any manner, arrange for the disposal or treatment of any Hazardous Substances; provided, however, that nothing contained in this Section 16.17 shall prohibit Tenant from generating, transporting, treating, storing or disposing of those chemicals and products required in the normal operation of Tenant's business, including, without limitation, cleaning products and lubricating oils, so long as such generation, transporting, treating, storing or disposing, as the case may be, complies with all applicable federal, state and local laws, regulations, ordinances and regulations pertaining thereto and Tenant shall

43

indemnify and hold Landlord harmless from any damages and liabilities incurred by Landlord as a result of any violation of, or noncompliance by Tenant with, any Environmental Laws. Landlord and Tenant agree and covenant that they will comply with all Environmental Laws. Notwithstanding anything to the contrary provided herein, Landlord shall indemnify and hold Tenant harmless from any damages and liabilities incurred by Tenant as a result of any violation of, or noncompliance with, any Environmental Laws, provided such violation or noncompliance is not caused by Tenant.

16.18 GUARANTY. This Lease shall be guaranteed by Bally's Health & Tennis Corporation in accordance with the Guaranty attached hereto and made a part hereof as Exhibit G.

This Lease is signed and delivered as of July 16, 1992.

LANDLORD:

PRESIDENT'S SQUARE
LIMITED PARTNERSHIP,
a Texas limited partnership

By: TWENTY-TWENTY PROPERTIES,
    INC., a Texas corporation,
    as General Partner
By: _____
    Title: PRESIDENT

TENANT:

DALLAS HEALTH CLUBS, INC.,
a Texas corporation

By: _____
    Its: Senior Vice Presid

ATTEST:

By: _____
    Its: / Secretary
        └ Assistant

44

EXHIBIT "A"



WHEN RECORDED RETURN TO:
Paul E. Pesek, Esq.
Vial, Hamilton, Koch & Knox
1717 Main Street, Suite 4400
Dallas, Texas 75201

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (the "Agreement") is made as of this _____ day of July 1992 by and among President's Square Limited Partnership, a Texas limited partnership ("Borrower"); Dallas Health Clubs, Inc., a Texas corporation, doing business as President's Health Clubs ("Tenant"); and NationsBank of Texas, N.A., a national banking association ("Lender").

R E C I T A L S :

A. Lender has agreed to make a loan (the "Loan") to Borrower in the principal amount of Seven Hundred Twenty Thousand and No/100 Dollars ($720,000.00) which is or will be evidenced by a promissory note (the "Note") executed by Borrower, among others, in favor of Lender in the principal amount of the Loan for purposes of acquiring the Property (as defined herein).

B. The Note is or will be secured by a deed of trust thereto (the "Deed of Trust") executed by Borrower in favor of Lender covering certain real property situated in the County of Bexar, State of Texas as more particularly described on Exhibit "A" attached hereto. Such real property together with all improvements thereto is hereinafter referred to as the "Property". The Deed of Trust is to be recorded concurrently herewith.

C. Tenant is the tenant under that certain Lease Agreement dated as of July 16, 1992, by and between Borrower, as landlord (sometimes referred to herein as "Landlord"), and Tenant, as tenant (such Lease Agreement being herein referred to as the "Lease").

D. Tenant, as a condition to entering into the Lease, has required the execution of this Agreement whereby Lender agrees not to disturb Tenant's rights in the Property under the Lease should Lender foreclose the lien of the Deed of Trust, provided that Tenant is not in default under the Lease beyond the applicable cure period, if any, provided in the Lease and provided that Tenant from and after such event attorns to Lender or the purchaser at a foreclosure sale or under an agreement for deed in lieu of foreclosure (such purchaser and its respective successors and assigns being hereinafter collectively referred to as "Purchaser"), and Lender is willing to so agree on the terms and conditions hereafter provided.

NOW, THEREFORE, for and in consideration of the recitals herein and other good and valuable consideration, the parties hereto do hereby agree as follows:

1. LEASE SUBORDINATE TO MORTGAGE. The Lease is and shall be subject and subordinate and is hereby subordinated in all respects to the Loan and the Deed of Trust and to any renewal, modification, replacement or extension thereof.

2. AGREEMENT. Tenant hereby covenants and agrees that, during all such times as Lender is the beneficiary under the Deed of Trust:

(a) Modification and Termination. Tenant will not consent to any modification or termination (except pursuant to any right of Tenant to terminate the Lease as may be expressly authorized under the Lease) of the Lease unless Lender first consents thereto in writing, which consent shall not be unreasonably withheld with respect to any proposed modification which does not adversely affect Lender's security for the repayment of the Loan.

(b) Notice of Default. Tenant shall notify Lender, in writing concurrently with any notice given to Borrower of any default on the part of Borrower under the Lease, and agrees that Lender shall have the right (but not the obligation) to cure any breach or default specified in such notice within the time periods set forth in the Lease and Tenant shall not declare a default of the Lease, as to Lender, if Lender cures such default within the time period provided in the Lease for the cure thereof by Borrower; provided, however, so long as Lender commences and pursues such cure with diligence, in no event shall Lender's cure period be less than thirty (30) days notwithstanding anything to the contrary contained in the Lease.

(c) No Advance Rents. Tenant will make no payments or prepayments of rent more than one (1) month in advance of the time when the same become due under the Lease; and

(d) Assignment of Rents. Upon receipt by Tenant of written notice from Lender directing Tenant to make payment of rents under the Lease to Lender, Tenant shall comply with such direction to pay and shall not be required to determine whether Borrower is in default under the Loan. Borrower irrevocably authorizes and directs Tenant, upon receipt from Lender of such notice, to pay all rents and other monies payable by Tenant under the Lease to or at the direction of Lender, and Borrower irrevocably releases Tenant of any liability to Borrower for all payments so made, and any such payments made by Tenant to Lender or at Lender's direction shall constitute payments due under the Lease as rent and Borrower releases Tenant from claims for the monies so paid.

3.   _ATTORNMENT_.   In the event Lender should exercise any of its remedies under the Deed of Trust by foreclosure or otherwise, or become the owner of the Property, then the following agreements shall apply:

(a)   _Payment of Rent_.   Following receipt of written notice from Lender, Tenant shall pay to Lender all rental payments required to be made by Tenant pursuant to the terms of the Lease for the duration of the term of the Lease for which Tenant shall be released from any further liability to Borrower as set forth in paragraph 2(c) above;

(b)   _Continuation of Performance_.   Tenant shall be bound to Lender in accordance with all of the terms of the Lease for the balance of the term thereof, and Tenant hereby attorns ·to Lender as its landlord under the terms and provisions set forth in the Lease, such attornment to be effective and self-operative without the execution of any further instrument immediately upon Lender succeeding ·to the lessor's interest in the Lease and giving written notice thereof to Tenant.   Tenant agrees to provide appropriate and reasonable written confirmation of· the foregoing upon reasonable request of Lender;

(c)   _No Offset_.   In the event that Lender or any Purchaser shall succeed to the interest of Borrower under the Lease, Lender or such Purchaser, as the case my be, agrees to be bound to Tenant and to assume all of Borrower's obligations under all of the terms, covenants and conditions of the Lease arising from and after the date Lender or Purchaser acquires Borrower's interest under the Lease. Tenant shall have the same remedies against Lender or such Purchaser, as the case may be, for breach of any covenant or agreement contained in the Lease arising during the respective periods in which such party is the owner of Borrower's interest under the Lease, that Tenant might have had against Borrower if Lender or such Purchaser had not succeeded to the interest of Borrower; provided, ·however, Lender shall not be liable for, or bound by, any representation or warranty contained in Section 1.1, Section 1.4, Section 16.14 or Section 16.17 of the Lease, it being expressly understood and agreed that Tenant's sole recourse for any such breach shall be brought or maintained against Borrower; provided, further, however, Lender shall comply with all Environmental Laws pertaining to the Premises from and after the date of foreclosure.   Notwithstanding the foregoing, in the event of a casualty upon the "Premises" (as such term is defined in the Lease), Lender shall not require proceeds of insurance attributable to the Premises to be applied against the Loan, so long as no default or event of default by Borrower then exists under the Loan and so long as such proceeds are used for the sole purposes of repairing and restoring the Premises in accordance with the terms contained in the Deed of Trust.   Notwithstanding anything to the

contrary contained herein, in no event shall Lender have any obligation or duty with respect to any covenant or obligation of the Landlord under the Lease to terminate the Enterprise Rent-A-Car nonconforming tenancy as described in Section 1.4(i) of the Lease; provided, however, such exclusion shall not be deemed to abrogate Tenant's remedies for breach of the covenant of quiet enjoyment contained in Section 6.1 of the Lease.   Further, notwithstanding anything to the contrary contained herein, Lender shall not be liable for, nor subject to, any offsets or defenses which Tenant may have by reason of any act or omission of Borrower as prior lessor, nor for the return of any sums which Tenant may have paid to Borrower as prior lessor as and for security deposits, advance rentals or otherwise, except to the extent that such sums are actually delivered by Borrower to Lender.   Further, Tenant hereby expressly agrees that any person or entity which anytime hereafter becomes the landlord under the Lease, including, without limitation, Lender and Purchaser, shall be liable only for the performance of the obligations or liabilities of the Landlord under the Lease which arise during the period of their respective ownership of the Property, and shall not be liable for any obligations or liabilities of any prior landlord (including Borrower) under the Lease which arise or accrue prior to the date Lender or Purchaser becomes the landlord under the Lease; and

(d)  No Personal Liability.  Notwithstanding anything to the contrary contained herein or in the Lease, Lender and Purchaser shall have no obligation, nor any liability, beyond Lender's or Purchaser's interest, if any, in the Property, and Tenant shall look exclusively to such interest of Lender and Purchaser, if any, in the Property for the payment and discharge of any obligations imposed upon Lender or Purchaser hereunder or under the Lease.   Tenant agrees that with respect to any money judgment which may be obtained or secured by Tenant against Lender or Purchaser, Tenant shall look solely to the estate or interest owned by the Lender or Purchaser in the Property, or any portion thereof or interest therein, and Tenant will not collect or attempt to collect any such judgment out of the other assets of Lender or Purchaser.

The provisions of this Paragraph 3 shall also run to the benefit of (i) any transferee of Borrower's title in and to the Property by Lender's exercise of its remedies under the Deed of Trust by foreclosure or otherwise, (ii) any transferee by deed in lieu of foreclosure, and (iii) any subsequent transferee of title to the Property following the occurrence of (i) or (ii) preceding.

4.   NON-DISTURBANCE.   In the event of a foreclosure of the Deed of Trust, so long as there shall then exist no breach, default, or event of default on the part of Tenant under the Lease beyond the applicable cure period, if any, provided in the Lease, Lender shall not join Tenant under the Lease in summary or

foreclosure proceedings for the purpose of terminating Tenant's leasehold interest in the Property, the leasehold interest of Tenant under the Lease shall not be diminished, disturbed, extinguished or terminated by reason of such foreclosure, but rather the Lease shall continue in full force and Lender and any successor in interest to Lender shall recognize and accept Tenant as tenant under the Lease subject to the terms and provisions of the Lease except as modified by this Agreement.

5.   CONFIRMATION OF EXISTING CIRCUMSTANCE.  By its execution hereof, Tenant and Landlord hereby represent and warrant to Lender that a true and correct copy of the Lease with all amendments is attached hereto as Exhibit "B".  The Lease has not been amended, modified, renewed, extended or altered except as indicated on Exhibit "B".

6.   MISCELLANEOUS.

(a)  Heirs, Successors, Assigns and Transferees.  The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto; and

(b)  Notices.  All notices or other communications required or permitted to be given pursuant to the provisions hereof shall be deemed served upon delivery or, if mailed, upon the first to occur of receipt or the expiration of seventy-two (72) hours after deposit in the United States Postal Service, certified mail, postage prepaid and addressed to the address of Tenant or Lender appearing below:

```
TENANT:   Dallas Health Clubs, Inc.
          d/b/a President's Health Clubs
          1374 Gamma Road
          Suite 100
          Dallas, Texas 75240
             Attn:  Area Director

          With a Copy to:

          Dallas Health Clubs, Inc.
          c/o Bally's Health & Tennis Corporation
          8700 West Bryn Mawr Avenue
          Chicago, Illinois 60631
             Attn:  General Counsel

          and

          Dallas Health Clubs, Inc.
          c/o Bally's Health & Tennis Corporation
          2029 Century Park East, Suite 2810
          Los Angeles, California 90067
             Attn:  Directory of Property Management
```

```
BORROWER: President's Square Limited Partnership
          c/o Twenty-Twenty Properties
          10440 North Central Expressway
          Suite 700, Lock Box 700
          Dallas, Texas 75231-2215
             Attn: John L. Cole

LENDER:   NationsBank of Texas, N.A.
          P.O. Box 830301
          Dallas, Texas 75283-0301
             Attn: Barbara Bartlett

          With a Copy to:

          NationsBank of Texas, N.A.
          P.O. Box 830301
          Dallas, Texas 75283-0301
             Attn: Linda Zimmerman, Counsel
```

Provided, however, that any party shall have the right to change its address for notice hereunder by giving written notice thereof to the other party in the manner set forth hereinabove; and

(c) <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute and be construed as one and the same instrument; and

(d) <u>Remedies Cumulative</u>.  All remedies provided herein are cumulative and shall be in addition to any and all other rights and remedies provided by law and by other agreements between Lender and Borrower or others; and

(e) <u>Paragraph Headings</u>.  Paragraph headings in this Agreement are for convenience only and are not to be construed as part of this Agreement or in any way limiting or applying the provisions hereof;

(f) <u>Further Assurances</u>.  At the request of either party hereto, the other party shall execute, acknowledge and deliver such other documents and/or instruments as may be reasonably required by the requesting party in order to carry out the purpose of this Agreement, provided that no such document or instrument shall modify the rights and obligations of the parties provided herein.

(g) <u>Conflicts</u>.  In the event of any inconsistency between the terms of this Agreement and the Lease, the terms of this Agreement shall control.

(h) <u>Attorneys' Fees</u>.  The prevailing party shall be entitled to recover from the other party its reasonable costs, including reasonable attorneys' fees, in any action brought by any party against the other to enforce any rights or obligations under this Agreement.

(i) <u>Incorporation</u>.  <u>Exhibit "A"</u> and <u>Exhibit "B"</u> are attached hereto and incorporated herein by this reference.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

TENANT:

DALLAS HEALTH CLUBS, INC.,
a Texas corporation

By: _____

Title: _____

BORROWER:

PRESIDENT'S SQUARE LIMITED
PARTNERSHIP, a Texas limited
partnership

By: TWENTY-TWENTY PROPERTIES, INC.
    a Texas corporation,
    its general partner

    By: _____

    Title: _____

LENDER:

NATIONSBANK OF TEXAS, N.A.,
a national banking association

By: _____

Title: _____

STATE OF _____ )
                     )
COUNTY OF _____ )

     The foregoing instrument was ACKNOWLEDGED before me this ____
day of July 1992 by _____, the
                    of Dallas Health Clubs, Inc., a Texas
corporation, on behalf of said corporation.

                              _____
                              Notary Public, State of _____

                              _____
                              Printed Name of Notary Public

                              My Commission Expires: _____

STATE OF _____ )
                     )
COUNTY OF _____ )

     The foregoing instrument was ACKNOWLEDGED before me this ____
day of July 1992 by _____, the
                    of Twenty-Twenty Properties, Inc., a Texas
corporation, general partner of President's Square Limited
Partnership, a Texas limited partnership, on behalf of said
partnership.

                              _____
                              Notary Public, State of _____

                              _____
                              Printed Name of Notary Public

                              My Commission Expires: _____

STATE OF TEXAS        )
                      )
COUNTY OF DALLAS      )

     The foregoing instrument was ACKNOWLEDGED before me this ____
day of July 1992 by _____, the
                    of NationsBank of Texas, N.A., a
national banking association, on behalf of said association.

                              _____
                              Notary Public, State of Texas

                              _____
                              Printed Name of Notary Public

                              My Commission Expires: _____

EXHIBIT "A"

LEGAL DESCRIPTION OF PROPERTY



60

EXHIBIT "A"

Lot Two (2), in Block Two (2), NEW CITY BLOCK 17417, TRISOURCE SUBDIVISION, City of San Antonio, Bexar County, Texas, according to the plat thereof recorded in Volume 9507, Page 176, Deed and Plat Records of Bexar County, Texas, and being more particularly described by metes and bounds as follows:

4.58 acres (199,290 square feet) of land being all of Lot 2, Block 2, NCB 17417, Trisource Subdivision, City of San Antonio, Bexar County, Texas, according to Plat thereof recorded in Volume 9507, Page 176 of the Deed and Plat Records of Bexar County, Texas, said 4.58 acres of land being more particularly described as follows, to wit:

Beginning:    at an iron pin found in the east right-of-way line of Cable Ranch Road out of Westlakes Subdivision Unit 3 according to Plat thereof recorded in Volume 9503, Pages 185-187 of the Plat Records of Bexar County, Texas and being the most westerly corner of the herein described tract and of said Lot 2, said point being N 00° 16' 26" E, 150.00 feet from the northeast corner of the intersection of the east right-of-way line of Cable Ranch Road and the north right-of-way line of Marbach Road;

Thence:    N 00° 16' 26" E, 448.20 feet along the west line of said Lot 2 and the east right-of-way line of said Cable Ranch Road to an iron pin found for the northwest corner of the herein described tract and of said Lot 2, said point also being the southwest corner of Lot 3, Block 2, NCB 17417 out of said Trisource Subdivision;

Thence:    with the northerly line of said Lot 2 and the herein described tract and the south line of said Lot 3, S 89° 43' 34" E, 365.41 feet to an iron pin found for the northeast corner of the herein described tract, said point also being the northwest corner of Lot 4, Block 2, NCB 17417, Westlakes Subdivision Unit 9 according to plat thereof recorded in Volume 9507, Page 128 of the Deed and Plat Records of Bexar County, Texas;

Thence:    S 00° 16' 26" W, 598.20 feet along and with the east line of said Lot 2 and the west line of said Lot 4 to an iron pin found in the north right-of-way line of Marbach Road for the southeast corner of said Lot 2 and the herein described tract, said point also being the southwest corner of said Lot 4;

Thence:    N 89° 43' 34" W, 215.41 feet along and with the north right-of-way line of Marbach Road and the south line of said Lot 2 to an iron pin found for the southwest corner of the herein described tract;

Thence:    along and with a westerly line of said Lot 2 and the herein described tract as follows:

N 00° 16' 26" E, 70.00 feet to an iron pin found for an angle point;

N 44° 43' 34" W, 113.14 feet to an iron pin found for an angle point;

N 89° 43' 34" W, 70.00 feet to the POINT OF BEGINNING, and containing 4.58 acres (199,290 square feet) of land, more or less.



EXHIBIT "B"


Lease



EXHIBIT "B"

<u>SITE PLAN SHOWING THE PARKING
AREAS AND THE COMMON AREAS</u>



53

EXHIBIT "C"

SITE PLAN SHOWING THE PREMISES



54



EXHIBIT "D"

LEGAL DESCRIPTION OF THE SHOPPING CENTER

Lot 2, Block 2, New City Block 17417, Trisource Subdivision, in the City of San Antonio, Bexar County, Texas, according to the plat thereof recorded in Volume 9507, Page 176, Deed and Plat Records of Bexar County, Texas.



55

EXHIBIT "E"

APPROVED PLANS AND SPECIFICATIONS



56

EXHIBIT F

SIGN PLAN

Tenant intends to install the following signage to the maximum
size permitted by local codes.

1.  Front of building: "Bally's President's Health Club"

2.  Monument sign(s): "President's Square"

3.  Pylon sign: "President's Square" and "Bally's President's
    Health Club"

See sketches attached to and made part of this exhibit.

July 8, 1992
Page 1 of 4





EXHIBIT- F





NEW BACK ILLUM. SIGNAGE
(SIM. TO EXISTING)

PRESIDENT'S SQUARE

NEW BACK ILLUM. SIGNAGE
(SIM. TO EXISTING)

SIGN ELEVATION          PYLON SIGN
OPPOSITE SIDE SAME

EXHIBIT- F





—NEW BACK ILLUM. SIGNAGE (SIM. TO EXISTING)

PRESIDENT'S SQUARE

8725 Marbach Rd.

—NEW BACK ILLUM. SIGNAGE (SIM. TO EXISTING)



PRESIDENT'S SQUARE

Cable Ranch Rd.
Entrance

8 JUL 92

SIGN ELEVATIONS          MONUMENT SIGNS
OPPOSITE SIDE SAME

EXHIBIT "G"

GUARANTY OF BALLY'S HEALTH & TENNIS CORPORATION



FOR VALUE RECEIVED, and in consideration for, and as an inducement to President's Square Limited Partnership, as Landlord, to enter into a Lease dated as of July 16, 1992 (the "Lease"), for certain premises located within the property commonly known as International Square and located at 8715 Harbach Road, San Antonio, Texas (the "Shopping Center"), with Dallas Health Clubs, Inc., a Texas corporation, as Tenant, the undersigned guarantees the full performance and observance of all the covenants, conditions and agreements contained in the Lease provided to be performed and observed by Tenant, Tenant's successors and assigns, and expressly agrees that the validity of this Guaranty and any obligations of Bally's Health & Tennis Corporation, as guarantor (the "Guarantor") hereunder shall not be terminated, affected, or impaired by reason of the granting by Landlord of any indulgences to Tenant or by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.

The undersigned further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of said Lease provided notice thereof is duly delivered to the Guarantor as provided in the Lease. The undersigned further agrees that its liability under this Guaranty shall be primary, and that in any right or action which shall accrue to Landlord under the Lease, Landlord may, at Landlord's option, proceed against the undersigned without having commenced an action against or having obtained any judgment against Tenant. In any action under this Guaranty, the prevailing party shall be entitled to recover, in addition to any damages, its reasonable attorneys' fees and costs incurred in such proceeding. The undersigned further represents to Landlord, as an inducement for Landlord to make the Lease, that the shareholders of the undersigned own all of the entire outstanding capital stock of Tenant, that the execution and delivery of the Guaranty is not in contravention of its Charter or By-Laws or applicable state laws, and has been duly authorized by its Board of Directors.

It is agreed that the failure of Landlord to insist in any one or more instance upon a strict performance or observance of any of the terms, provisions, or covenants of the Lease or to exercise any right therein contained shall not be construed or deemed to be a waiver or relinquishment for the future of such term, provision, covenant, or right and that the same shall continue and remain in full force and effect. Receipt by Landlord of rent with knowledge of the breach of any provision of the Lease shall not be deemed a waiver of such breach.

58

No subletting, assignment, or other transfer of the Lease, or any interest therein, other than as specifically provided herein, shall operate to extend or diminish the liability of the Guarantor under this Guaranty; and whatever reference is made to the liability of Tenant within the Lease, such reference shall be deemed likewise to refer to the Guarantor. It is further agreed that all the terms and provisions hereof shall inure to the benefit of the successors and assigns of Landlord, and shall be binding upon the successors and assigns of the undersigned.

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of this ____ day of _____, 1992.

GUARANTOR

BALLY'S HEALTH AND TENNIS CORPORATION

By:_____
Its:_____

IN THE PRESENCE OF:

_____

_____

59

## GUARANTY OF BALLY'S HEALTH & TENNIS CORPORATION

FOR VALUE RECEIVED, and in consideration for, and as an inducement to President's Square Limited Partnership, as Landlord, to enter into a Lease dated as of July 16, 1992 (the "Lease") for certain premises located within the property commonly known as International Square and located at 8715 Marbach Road, San Antonio, Texas (the "Shopping Center"), with Dallas Health Clubs, Inc., a Texas corporation, as Tenant, the undersigned guarantees the full performance and observance of all the covenants, conditions and agreements contained in the Lease provided to be performed and observed by Tenant, Tenant's successors and assigns, and expressly agrees that the validity of this Guaranty and any obligations of Bally's Health & Tennis Corporation, as guarantor (the "Guarantor") hereunder shall not be terminated, affected, or impaired by reason of the granting of any indulgences to Tenant or by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.

The undersigned further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of said Lease provided notice thereof is duly delivered to the Guarantor as provided in the Lease. The undersigned further agrees that its liability under this Guaranty shall be primary, and that in any right or action which shall accrue to Landlord under the Lease, Landlord may, at Landlord's option, proceed against the undersigned without having commenced an action against or having obtained any judgment against Tenant. In any action under this Guaranty, the prevailing party shall be entitled to recover, in addition to any damages, its reasonable attorneys' fees and costs incurred in such proceeding. The undersigned further represents to Landlord, as an inducement for Landlord to make the Lease, that the shareholders of the undersigned own all of the entire outstanding capital stock of Tenant, that the execution and delivery of the Guaranty is not in contravention of its Charter or By-Laws or applicable state laws, and has been duly authorized by its Board of Directors.

It is agreed that the failure of Landlord to insist in any one or more instance upon a strict performance or observance of any of the terms, provisions, or covenants of the Lease or to exercise any right therein contained shall not be construed or deemed to be waiver or relinquishment for the future of such term, provision, covenant, or right and that the same shall continue and remain in full force and effect. Receipt by Landlord of rent with knowledge of the breach of any provision of the Lease shall not be deemed a waiver of such breach.

No subletting, assignment, or other transfer of the Lease, or any interest therein, other than as specifically provided herein, shall operate to extend or diminish the liability of the Guarantor under this Guaranty; and whatever reference is made to the

liability of Tenant within the Lease, such reference shall be deemed likewise to refer to the Guarantor. It is further agreed that all the terms and provisions hereof shall inure to the benefit of the successors and assigns of Landlord, and shall be binding upon the successors and assigns of the undersigned.

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of this 16th day of July, 1992.

GUARANTOR

BALLY'S HEALTH AND TENNIS CORPORATION

By: _____

Its: _Senior Vice President_

IN THE PRESENCE OF:

2



FIRST AMENDMENT
TO
LEASE AGREEMENT
FOR
DALLAS HEALTH CLUBS, INC.
INTERNATIONAL SQUARE
SAN ANTONIO, TEXAS

THIS FIRST AMENDMENT TO LEASE AGREEMENT ("Amendment") is made on July 17, 1992 between PRESIDENT'S SQUARE LIMITED PARTNERSHIP, a Texas limited partnership, as landlord ("Landlord"), having its principal place of business at 8715 Marbach Road, San Antonio, Texas, consisting of TWENTY-TWENTY PROPERTIES, INC., a Texas corporation, as its general partner (the "General Partner") and JOHN COLE, an individual resident of Texas, MELVA COLE, an individual resident of Texas and BRIAN PICKETT, M.D., an individual resident of Texas, as limited partners (collectively the "Limited Partners") ,DALLAS HEALTH CLUBS, INC., a Texas corporation, doing business as PRESIDENT'S HEALTH CLUB, having its principal place of business located at 13714 Gamma Road, Suite 100, Dallas, Texas 75240, as tenant ("Tenant").

RECITALS

1.     Landlord and Tenant entered into that certain Lease (the "Lease) dated July 16, 1992 pursuant to which Landlord has agreed to lease to Tenant the Premises as well as grant to Tenant the non-exclusive use of the Common Areas and the Parking Areas in the Shopping Center known as International Square Shopping Center and located at 8715 Marbach Road, San Antonio, Texas, and Tenant has agreed to accept the same.

2.     Landlord and Tenant desire to amend the Lease as hereinafter provided.

NOW THEREFORE, in consideration of the foregoing premises, the terms and conditions hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, the parties agree as follows:

AGREEMENTS

1.     The Recitals hereinabove set forth are incorporated herein and made an integral part hereof.  All capitalized terms used herein shall have the same meanings ascribed to such terms as are set forth in the Lease.

2.     Section 11.3 of the Lease is hereby amended by adding the following paragraph at the end thereof:



"However, Landlord does not indemnify Tenant against any claim based upon, or in any way caused by the negligence or willful misconduct of Tenant or its agents, contractors, employees, licensees or representatives.  Landlord does not indemnify Tenant against any claims or damages arising out of any injury to or death of a person or property damage resulting from the type of risk covered by a public liability or property damage insurance policy in which Tenant is an insured party, or for injury to or death of any person or damage to property resulting from the use or intended use of the Premises."

3.    Except as hereinabove specifically provided, all terms and conditions set forth in the Lease are reaffirmed and restated in their entirety.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the date hereinabove set forth.

LANDLORD:                          TENANT:

PRESIDENT'S SQUARE LIMITED         DALLAS HEALTH CLUBS, INC., a
PARTNERSHIP, a Texas               Texas corporation
limited Partnership

                                   By: _____
By: Twenty-Twenty Properties           Its: Senior Vice President
    Inc., a Texas corporation
    as general partner

By: _____
    Its: President

Corp. No. 625:28
President's Square

## ASSIGNMENT OF LEASE

THIS ASSIGNMENT OF LEASE ("Assignment") is made as of 6th day of _____, 1994, by and between HEALTH & TENNIS CORPORATION OF AMERICA, a Delaware corporation ("Assignee") and DALLAS HEALTH CLUBS, INC., a Texas corporation ("Assignor") and TRANSCONTINENTAL REALTY INVESTMENTS ("Landlord").

### W I T N E S S E T H:

WHEREAS, the respective Boards of Directors of Assignee and Assignor have deemed it advisable that Assignor be merged into Assignee (the "Merger"), effective on the date (the "Effective Date") the Merger Agreement between the parties is filed in the appropriate governmental office;

WHEREAS, as of the Effective Date, all of the assets and liabilities of Assignor shall become, without further action, the assets and liabilities of Assignee;

WHEREAS, Landlord and Assignor entered into that certain lease ("Lease") dated July 16, 1992, as may have been amended;

WHEREAS, pursuant to the Lease, Assignor, as tenant, leased certain premises located at 8715 Marbach Road, San Antonio, TX 78227 (the "Leased Premises"); and

WHEREAS, pursuant to the Merger, Assignor, Assignee, Landlord desire that, effective as of the Effective Date, Assignor assigns to Assignee with Landlord's consent, and Assignee assumes, all of Assignor's rights, interests and obligations in, to and under the Lease for the remainder of the term thereof, subject to the terms of the Lease.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and sufficient consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    Effective as of the Effective Date, Assignor does hereby assign to Assignee the Lease and Assignor's rights relative to the Leased Premises for the remainder of the term of the Lease, pursuant to the terms of the Lease; and Assignee, as of the Effective Date, does hereby assume all obligations of Assignor under the Lease, pursuant to its terms.

2.    Effective as of the Effective Date, Assignor does hereby assign to Assignee all of Assignor's right and interest in and to all deposits held by Landlord, if any, as security for the performance by Assignor of its obligations under the Lease.

EXHIBIT
C

3.   Landlord consents to this Assignment.

IN WITNESS WHEREOF, Assignor, Assignee and Landlord have executed this Assignment as of the date first written above.

**ASSIGNEE:**

**HEALTH & TENNIS CORPORATION OF AMERICA**, a Delaware corporation

Sign: _____
Print name: ANN L. WALANKA

Sign: _____
Print name: Dinia Garner

By: _____
Its: SENIOR VICE PRESIDENT

**ASSIGNOR:**

**DALLAS HEALTH CLUBS, INC.,** a Texas corporation

Sign: _____
Print name: ANN L. WALANKA

Sign: _____
Print name: Dinia Garner

By: _____
Its: SENIOR VICE PRESIDENT

**TRANSCONTINETAL REALTY INVESTMENTS**

Sign: Michelle C. McDowell
Print name: Michelle C. McDowell

Sign: Candace Garwick
Print name: Candace Garwick

By: _____
Its: Vice President

**LEASE GUARANTOR:**

**BALLY'S HEALTH & TENNIS CORPORATION**

Sign: _____
Print name: ANN L WALANKA

Sign: _____
Print name: Dinia Garner

By: _____
Its: _____

2

STATE OF ___Illinois___ ) 
                        )  SS:
COUNTY OF ___Cook___    )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, HEALTH & TENNIS CORPORATION OF AMERICA, a Delaware corporation, by _Casey W. Gaad_ , its _SENIOR VICE PRESIDENT_ , who acknowledged that he/she did sign the foregoing instrument for and on behalf of the Corporation, being thereunto duly authorized by its Board of Directors; that the same is his/her free act and deed individually and as such officer and the free act and deed of the Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 8TH day of ___June___ , 1994.

> " OFFICIAL SEAL "
> KAREN LYNN O'SHEA
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES  5/3/95

Notary Public
My commission expires: _May 3, 95_

STATE OF ___Illinois___ ) 
                        )  SS:
COUNTY OF ___Cook___    )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, DALLAS HEALTH CLUBS, INC., a Texas corporation, by _Casey W. Gaad_ , its _SENIOR VICE PRESIDENT_ , who acknowledged that he/she did sign and seal the foregoing instrument for and one behalf of the Corporation, being thereunto duly authorized by its Board of Directors; that the same is his/her free act and deed individually and as such officer and the free act and deed of the Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this 8TH day of ___June___ , 1994.

> " OFFICIAL SEAL "
> KAREN LYNN O'SHEA
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES  5/3/95

Notary Public
My commission expires: _May 3, 95_

STATE OF _Texas_    )
                    ) SS:
COUNTY OF _Dallas_  )

    Personally appeared before me, the undersigned, a Notary Public in and for said County and State, TRANSCONTINENTAL REALTY INVESTMENTS, by _David W. Starowicz_, its _Vice President_, who acknowledged that he/she did sign the foregoing instrument for and on behalf of TRANSCONTINENTAL REALTY INVESTMENTS and that the same is his/her free act and deed individually and the free act and deed of TRANSCONTINENTAL REALTY INVESTMENTS.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _15_ day of _July_, 1994.

Notary Public
My commission expires:

ANDREA J. RODGERS
MY COMMISSION EXPIRES
February 4, 1998

STATE OF _Illinois_ )
              ) SS:
COUNTY OF _Cook_ )

    Personally appeared before me, the undersigned, a Notary Public in and for said County and State, BALLY'S HEALTH & TENNIS CORPORATION, by _____, its _Senior Vice President_, who acknowledged that he/she did sign the foregoing instrument for and on behalf of the Corporation, being thereunto duly authorized by its Board of Directors; that the same is his/her free act and deed individually and as such officer and the free act and deed of the Corporation.

    IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _4th_ day of _July_, 1994.

Notary Public
My commission expires: _____

This instrument prepared by:

Assignee

" OFFICIAL SEAL "
KAREN LYNN O'SHEA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5/3/95



BALLY TOTAL FITNESS CORPORATION
8700 West Bryn Mawr Avenue
Chicago, Illinois 60631
773-380-3600
www.ballyfitness.com

Rob Flores
Property Manager
rflores@ballyfitness.com
tel: 773-864-3652

**BALLY**
TOTAL FITNESS™

<u>Via Overnight Delivery – DHL</u>
email copy: mf@furstcommercial.com

September 27, 2007

Mr. Michael B. Furst
President's Square Retail Associates, Ltd.
c/o Furst Commercial Real Estate, Inc.
2 Hughes, Suite 200
Irvine, CA 91618-2021

      RE:    Lease Agreement dated July 16, 1992 (as amended, "Lease") by and between
            President's Square Retail Associates, Ltd. ("Landlord") and Bally Total Fitness
            Corporation ("Tenant") for the premises located at 8725 Marbach Road, San
            Antonio, TX.

Dear Mr. Furst:

In accordance with the terms and conditions of Section 2.3 the Lease (and referenced above), Tenant
hereby notifies Landlord of its election to exercise the Option Term for an additional five (5) years.
Accordingly, the expiration date of the Lease will be January 31, 2013.

Please contact me if you have any questions or concerns with this notice.

Respectfully,

Rob Flores
Property Manager

cc:    Ron Siegel, Esq.

---

**EXHIBIT**

D

President's Square, TX

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (the "Assignment") is executed as of April 30, 2012, by and between Bally Total Fitness Corporation ("Assignor"), and Blast Fitness Acquisitions, LLC ("Assignee").

## RECITALS:

WHEREAS, President's Square Retail Associates, Ltd. ("Landlord") and Assignor are parties to that certain Lease ("Lease") dated July 16, 1992, by and between Bally Total Fitness Corporation, as successor in interest to Dallas Health Clubs, Inc., and President's Square Retail Associates, Ltd., as successor in interest to President's Square Limited Partnership, a true and complete copy of which is attached hereto as Exhibit A and incorporated herein as a part hereof, regarding certain space located at 8725 Marbach Road, San Antonio, Texas 78227-2376, and further described in said Lease (the "Premises"); and

WHEREAS, Assignor desires to assign to Assignee, and Assignee desires to receive from Assignor and assume, all of the rights and obligations of Assignee under said Lease, all pursuant to the terms of this Assignment.

NOW, THEREFORE, in consideration of Ten and 00/100 Dollars ($10.00) and other good and valuable consideration in hand paid, the receipt and sufficiency of which are hereby acknowledged, and of the mutual covenants set forth below, the parties agree as follows:

1.      Defined Terms.  All capitalized, defined terms used in this Assignment shall have the same definitions as those set forth in the Lease, except as otherwise specifically indicated or unless the context clearly indicates to the contrary.

2.      Assignment.  Assignor hereby assigns to Assignee all of Assignor's rights and obligations as tenant under the Lease first arising from and after the date hereof, subject to the conditions and limitations in Paragraph 9.

3.      Assumption.  Assignee hereby accepts the foregoing assignment of Assignor's rights and obligations under the Lease and assumes and agrees to perform all of the terms and obligations of the tenant under the Lease first arising from and after the date hereof.

4.      Successors and Assigns.  This Assignment shall be binding upon Assignor, Assignee and their respective successors and assigns.

5.      Covenants of Assignor  Assignor hereby covenants, represents and agrees as follows:

(a)     The Assignor hereby indemnifies and holds harmless the Assignee, strictly in accordance with paragraph 10(a) of that certain Asset Purchase Agreement dated the 10th day of April, 2012 (the "APA") by and among Bally Total Fitness Corporation, Bally Total Fitness of the Mid-Atlantic, Inc., Bally Total Fitness of Greater New York, Inc., Bally Total Fitness of the Midwest, Inc., and Blast


EXHIBIT
E

Fitness Acquisition, LLC and a wholly owned subsidiary of Blast Fitness Group, LLC;

(b)     The Assignee hereby indemnifies and holds harmless the Assignor strictly in accordance with paragraph 10(b) of the APA, from and against any, and all damage, loss liability or expense, including all reasonable legal fees and disbursements which Assignee may incur as a result of any breach by Assignee of its obligations under the Lease occurring after the date of this Assignment;

(c)     the Assignor represents and warrants that it has a valid and subsisting leasehold estate under the Lease, the Lease is in full force and effect, and Assignor has paid all rent and other monies due and owing pursuant to the Lease, and Assignor has not received any notice of default from Landlord that has not been cured.

(d)     the Assignor will not terminate or take any action to terminate the Lease prior to the Lease being assigned and assumed by Assignee in accordance with the terms hereof.

6.      Fixtures and Personal Property.  All transfers of the personal property located in the Premises, including but not limited to all inventory, trade fixtures, furnishings, accounts receivables, chattels, equipment, or other personal property whether temporary or permanent shall be conveyed pursuant to the APA.

7.      Governing Law.  This Assignment shall be construed in accordance with and be governed by the laws of the State of Delaware.

8.      Counterparts.  This Assignment may be executed with facsimile signatures and/or in any number of counterparts, each of which shall be deemed an original and all of such counterparts when taken together shall constitute but one and the same document which shall be sufficiently evidenced by such executed counterparts.

[SIGNATURE PAGE TO FOLLOW]

- 2 -

IN WITNESS WHEREOF, the parties hereto have duly executed this Assignment as of the date first above stated.

ASSIGNOR:

Bally Total Fitness Corporation

By: _Ronald E. Siegel_____
Name: _Ronald E. Siegel_____
Its:      Assistant Vice President

ASSIGNEE:

Blast Fitness Acquisitions, LLC

By: _____
Name: _Harold Dixon_____
Its: _____mgr_____

- 3 -

EXHIBIT A

Lease

[Attached]



- 4 -

## ASSIGNMENT OF LEASE

Corporation

For value received, the undersigned Bally Total Fitness, successor in interest to Health & Tennis Corporation of America, a Delaware corporation, successor in interest to Dallas Health Clubs, Inc., a Texas corporation ( the "Tenant" ) is the tenant under the lease (the "Original Lease") dated July 16, 1992 by and between Tenant and President's Square Retail Association, Ltd., successor in interest to President's Square Limited Partnership ("Landlord"), and covering the premises located at 8715 Marbach Road Suite 100, San Antonio, Texas 78227, do hereby assign all of their rights, title and interest in and to said lease together with the options and lease security as set forth therein, to Blast Fitness President Square, LLC, a Texas limited liability company, dba Blast Fitness. This Assignment of Lease has a reference date of *April 31, 2012.*

Dated this 16th day of June , 2012.

Bally Total Fitness Corporation

_Ronald E. Siegel_

Ronald E. Siegel
Assistant Vice President, Property Management

## ASSUMPTION OF LEASE

For value received, and in consideration of the above assignment by the Tenant, and in consideration of the written consent of the Landlord thereto, the undersigned hereby assumes and agrees to make all the payments, and to perform all of the terms, covenants and conditions of the foregoing lease, and which the said Tenant therein has agreed to make and perform effective the 1st day of May, 2012.

Dated this 17 day of May , 2012.

Blast Fitness Acquisition, LLC d/b/a
Blast Fitness President's Square

Its: MANAGER

## CONSENT TO ASSIGNMENT

For value received, and in consideration of the assumption of the lease referred to hereinbefore by the above prior named assignee of said lease, the undersigned Landlord hereby consents to the above assignment, but does not thereby waive any of his rights under said lease or any extensions thereof, as to the Tenant, or as to any assignees effective the 1st day of May, 2012.

Dated this 25 day of JUNE , 2012.

President's Square Retail Associates, Ltd.,
a Texas limited partnership

Pres. Square Management Corp
Its General Partner

By: _Michael Forst_
Michael Forst
Its President

## FIRST AMENDMENT TO LEASE AGREEMENT

This First Amendment is made as of this first day of May 2013 between President's Square Retail Associates, Ltd., a Texas limited partnership ("Landlord") and Blast Fitness President's Square, LLC dba Blast Fitness ("Tenant") with respect to and forming a part of that certain Lease Agreement dated July 10, 1992 by and between President's Square Limited Partnership as Landlord and Dallas Health Clubs, Inc. as Tenant (the "Lease") for the premises commonly known as President's Square Retail Center, 8715 Marbach Road, Suite 100, being located on lot two (2), New City Block 1417, Treasures Subdivision, City of San Antonio, Bexar County, Texas, according to Plat thereof recorded in Volume 9507, Page 176, Deed and Plat Records of Bexar County, Texas ("Premises").

WHEREAS, Tenant and Landlord wish to extend the lease term for an additional five (5) years;

NOW THEREFOR WITNESSETH:

A.  TERM – Effective February 1, 2013 through January 31, 2018, Tenant shall lease the 23,125 rentable square feet in Suite 100 at 8715 Marbach Road for sixty (60) additional months.

B.  RENT SCHEDULE – Effective May 1, 2012 through January 31, 2013 the monthly base rent will be free. Common Area Maintenance charges will continue to apply during this rent abatement period. Effective February 1, 2013 through January 31, 2018 the monthly base rent shall be $14,700.00 through the termination date. Applicable common area maintenance charges, property tax and property insurance shall be in addition per the lease agreement.

C.  OPTIONS – Tenant shall have two (2) options to renew the lease for an additional 5 year term at a monthly base rent of $14,700.00 for the first option and $15,435.00 for the second 5 year option by Tenant giving written notice to Landlord one hundred eighty (180) or more days prior to the termination date.

D.  LANDLORD CONTRIBUTION – Landlord shall contribute a tenant improvement allowance up to $180,000 to Blast Fitness Group, LLC within 30 days after receipt of Tenant providing final lien waivers and copies of the supporting documentation (invoices) of amount spent by Tenant for structural improvements to include HVAC, electrical, plumbing, walls, lighting, paint, carpet, etc. (excludes Tenant's trade fixtures and personal property).

Except as amended herein, each and every term and condition contained in the Lease shall remain in full force and effect. In the event there are any differences, contradictions or inconsistencies between the Lease and this Amendment, the terms of this Amendment will prevail. Otherwise, the terms of the Lease that do not differ herewith or which are not contradictory or inconsistent with the terms of this Amendment will remain in full force and effect.

Agreed this _____1ST_____ day of ___MAY___ 2013.


EXHIBIT

**TENANT:**
Blast Fitness Presidents Square, LLC,
a Texas limited liability corporation

By: _____

Its:   President
       nonber

**LANDLORD:**
President's Square Retail Associates, Ltd.,
a Texas limited partnership

Pres. Square Management Corp
Its:   General Partner

By: _____
Michael Furst
Its: President

## GUARANTY

For value received and in consideration to Landlord for entering
into this Lease, Tenant, the undersigned, unconditionally
guarantees to Landlord, Landlord's successor and assigns, the
full, complete and punctual payment of all amounts due under
this Lease and the full, complete and punctual performance and
observance of all the provisions therein provided to be
performed and observed by Tenant, including without limitation
the rules and regulations, without requiring any notice of non-
payment, non-performance, or non-observance, or proof, or
notice, or demand, whereby to charge the undersigned therefore,
all of which the undersigned expressly waives and expressly
agrees that the validity of this agreement and the obligations
of the guarantor hereunder shall in no way be terminated,
affected or impaired by reason of the assertion by Landlord
against Tenant of any of the rights or remedies reserved to
Landlord pursuant to the provisions of the within Lease. As a
further inducement to Landlord to make this Lease and in
consideration thereof, Landlord and the undersigned agree that
in any action or proceeding brought by either Landlord or the
undersigned against the other on any matters whatsoever arising
out of, under, or by virtue of the terms of this Lease or of
this Guarantee, that Landlord and the undersigned shall and do
hereby waive trial by jury.  This is a guaranty of payment and
performance, not just ability to be collected; the Landlord
shall have no obligation to exercise any right or remedy or seek
payment or performance under the Lease against the Tenant before
proceeding against each or any of the undersigned.  The
obligations of the Landlord and all of the guarantors under the
Lease hereunder are joint and several.  Notwithstanding anything
to the contrary contained in this Guaranty, the Guarantor's
obligations hereunder shall terminate and shall be null and void
and held for naught upon the expiration of the first five (5)
year Option Term as set forth in the First Amendment to Lease
Agreement.

WITNESS/Tenant our hands this ___2___ day of ~~May   2012.~~ Aug 2012

originally signed 5/17/12

GUARANTOR(S)/Tenant(s):

Blast Fitness Acquisition, LLC

BY: _____

Its: _Manager_____

Redondo Retail Associates, Ltd. Lease Agreement with
Blast Fitness President's Square, LLC d/b/a Blast Fitness

STATE OF MARYLAND

COUNTY OF _____

On -this __2__ day of __August__ , 2012, before me, the

undersigned, __Harold R. Dixon__ personally appeared, personally

known to me (or proved to me on the basis of satisfactory

evidence) to be the person whose name is subscribed to the

within instrument and acknowledged to me that he executed the

same in his capacity, and that by his signature on the

instrument the person, or the entity upon behalf of which the

person acted, executed the instrument.


WITNESS my hand and official seal.

_M. McCann_ exp. 3/14/19
Notary Public in and for
said County and State

(S E A L)

Page 2                                    Initials(Tenant/Landlord)____/____

Book 16442 Page 253 5pgs                                          Doc# 20130239010

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON,
YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING
INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN
REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:
YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.
GF# 4713004010 ML

Special Warranty Deed with Vendor's Lien

**Date:**        15th day of November, 2013

**Grantor:**     Pres. Square Retail Associates, Ltd., a Texas limited partnership

**Grantor's Mailing Address:**

> Pres. Square Retail Associates, Ltd.
> 100 Canyon Creek
> Irvine, CA 92603-0422

**Grantee:**     Westheimer Regency I, L.P., a Texas limited partnership

**Grantee's Mailing Address:**

> Westheimer Regency I, L.P.
> 6448 E. Hwy 290, Suite F-101
> Austin, TX 78723

**Consideration:**

> Cash and a note of even date executed by Grantee and payable to the order of Austin
> Telco Federal Credit Union in the principal amount of ONE MILLION EIGHT HUNDRED
> FIFTY THOUSAND AND NO/100 DOLLARS ($1,850,000.00).  The note is secured by a first
> and superior vendor's lien and superior title retained in this deed in favor of Austin Telco Federal
> Credit Union and by a first-lien deed of trust of even date from Grantee to Tony Rawls, trustee.

**Property (including any improvements):**

> Lot 2, Block 2, New City Block 17417, Trisource Subdivision, in the City of San
> Antonio, Bexar County, Texas, according to the plat thereof recorded in Volume 9507,
> Page 176, Deed and Plat Records of Bexar County, Texas.

**Reservations from Conveyance:**

> None

**EXHIBIT**
G

**Exceptions to Conveyance and Warranty:**

Liens described as part of the Consideration and any other liens described in this deed as being either assumed or subject to which title is taken; validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Property, including specific exceptions set forth in Exhibit "A" attached hereto; and taxes for 2014, which Grantee assumes and agrees to pay, and subsequent assessments for that and prior years due to change in land usage, ownership, or both, the payment of which Grantee assumes.

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever.  Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

The vendor's lien against and superior title to the Property are retained until each note described is fully paid according to its terms, at which time this deed will become absolute.

Austin Telco Federal Credit Union, at Grantee's request, has paid in cash to Grantor that portion of the purchase price of the Property that is evidenced by the note.  The first and superior vendor's lien against and superior title to the Property are retained for the benefit of Austin Telco Federal Credit Union and are transferred to Austin Telco Federal Credit Union without recourse against Grantor.

When the context requires, singular nouns and pronouns include the plural.

Pres. Square Retail Associates, Ltd., a Texas limited partnership

By: Pres. Square Management Corporation, a Texas corporation
Its: General Partner

By: _Michael B. Furst_
Michael B. Furst
Its:  President

STATE OF CALIFORNIA                    }

COUNTY OF _ORANGE_  } S.S.

On _13TH_ day of November, 2013, before me, a Notary Public in and for said County and State, personally appeared, MICHAEL FURST, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _Mary Ann White_

MARY ANN WHITE
COMM. # 1939246
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
COMM. EXPIRES MAY 30, 2015

(Notary Seal)



Exhibit "A"

1.  Restrictions recorded in Volume 6712, Page 1980, Real Property Records, Bexar County, Texas.
2.  25 foot building setback line as shown on plat recorded in Volume 9507, Page 176, Real Property Records, Bexar County, Texas;
3.  14 foot electric easement shall begin 18 feet above existing ground as shown on plat recorded in Volume 9507, page 176, Real Property Records, Bexar County, Texas;
4.  15 foot sanitary sewer easement as shown on plat recorded in Volume 9507, page 176, Real Property Records, Bexar County, Texas;
5.  Easement(s), as provided therein, recorded in Volume 3123, Page 1726, Real Property Records, Bexar County, Texas;
6.  Interest in and to oil, gas, and other minerals and/or royalties, bonuses, rentals and all other rights relating thereto as set forth in the document recorded in Volume 2875, Page 1717 of the Real Property Records of Bexar County, Texas;
7.  Lease Agreement by and between President's Square Limited Partnership, a Texas limited partnership, as Landlord, and Dallas Health Clubs, Inc., a Texas corporation, as Tenant, as evidenced by Memorandum of Lease dated July 22, 1992, recorded in Volume 5396, Page 1961, Real Property Records of Bexar County, Texas;
8.  Assessments, charges and liens as set forth in Declaration/Bylaws filed for record April 4, 1996 and recorded in Volume 6712, Page 1980, Real Property Records of Bexar County, Texas.
9.  Overhead telephone line without benefit of an easement across Southeast corner of property, as shown on survey prepared by Robert M. Anguiano, R.P.L.S. No. 6347, dated September 27, 2013.

AFTER RECORDING RETURN TO:

Ellen Schwab
Chicago Title Ins. Co.
2828 Routh, Suite 800
Dallas, TX 75201



Doc# 20130239010
# Pages 5
11/20/2013  8:55AM
e-Filed & e-Recorded in the
Official Public Records of
BEXAR COUNTY
GERARD C. RICKHOFF
COUNTY CLERK
Fees $28.00

STATE OF TEXAS
COUNTY OF BEXAR
This is to Certify that this document
was e-FILED and e-RECORDED in the Official
Public Records of Bexar County, Texas
on this date and time stamped thereon.
11/20/2013  8:55AM
COUNTY CLERK, BEXAR COUNTY TEXAS



BLAST
MELTZER



# THE GOTTFRIED FIRM

### A PROFESSIONAL CORPORATION

WEST SIXTH PLACE
1505 WEST SIXTH STREET
AUSTIN, TEXAS 78703



PHONE
512-494-1481

FAX
512-472-4013
david@davidgottfriedlaw.com

November 7, 2014

Bally Health Clubs, Inc.          *via certified mail RRR 7014 0510 0002 3585 9439*
d/b/a President's Health Club
15000 Quorum Drive, Suite 100
Dallas, Texas 75240
Attn: Area Director

Dallas Health Clubs, Inc.          *via certified mail RRR 7014 0510 0002 3585 9422*
c/o Bally's Health & Tennis Corporation
8700 West Bryn Mawr Avenue
Chicago, Illinois 60631
Attn: General Counsel

Dallas Health Clubs, Inc.          *via certified mail RRR 7014 0510 0002 3585 9415*
c/o Bally's Health & Tennis Corporation
2029 Century Park East, Suite 2810
Los Angeles, California 90067
Attn: Director of Property Management

Tom Moran          *via certified mail RRR 7014 0510 0002 3585 8609*
Blast Fitness Group, LLC
2000 Commonwealth Avenue
Auburndale, MA 02466

Blast Fitness          *via certified mail RRR 7014 0510 0002 3585 8593*
8725 Marbach Road
San Antonio, Texas 78227

Greg Hines          *via email to greg.hines@blastfitness.com*
Regional Vice President Texas
Blast Fitness

Deborah S. Ashen          *via facsimile (312) 655-0801*
Ashen Faulkner
217 Jefferson Street, Suite 601
Chicago, Illinois 60661

Case Number: 2016CI00441          Document Type: PLAINTIFFS ORIGINAL PETITION          Page 106 of 124

EXHIBIT
14

# NOTICE OF DEFAULT

To whom it may concern,

On behalf of Westheimer Regency I, L.P. (hereafter "Westheimer"), you are hereby notified of your default under the Lease for failure to pay rent for the Property located at 8725 Marbach Road, San Antonio, Texas 78227 (hereafter the "Property"). If such failure continues for ten (10) days after notice, this failure will be a default under the Lease and Westheimer shall take appropriate action.

Very truly yours,

David M. Gottfried

THE LAW OFFICE OF
DAVID M. GOTTFRIED, P.C.
A Professional Corporation

DAVID M. GOTTFRIED

WEST SIXTH PLACE
1505 WEST SIXTH STREET
AUSTIN, TEXAS 78703
Phone   (512) 494-1481
Fax       (512) 472-4013

SENDER'S EMAIL:
david@davidgottfried.com

## Fax Memorandum

| TO: | Deborah Ashen | FAX No: | 312-655-0801 |
|---|---|---|---|
| COMP: | | THIS IS PAGE 1 OF 2 PAGES | |
| FROM: | David M. Gottfried | | |
| RE: | Blast Fitness, Lease of 8725 Maybach Road, San Antonio, Texas 78227 | FILE: | |
| DATE: | NOVEMBER 7, 2014 | IF THERE ARE PROBLEMS IN TRANSMISSION PLEASE CALL (512) 494-1481 | |

COMMENTS:

Please see attached letter

*Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this fax message is attorney-client privileged and confidential, intended for the use of the intended recipient named above. If the reader of this message is not the intended recipient (or the employee or agent responsible to deliver it to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error please immediately notify us by collect telephone or return the original message to us at the above address at our expense.*

S:\MELTZER, BRADLEY\BLAST FITNESS LEASE - WESTHEIMER\FAX COVER TO ASHEN.DOCX

HP Officejet Pro 8500 A910 All-In-One series

Fax Log for
5124724013
(512) 472-4013
Nov 07 2014 3:52PM

Last Transaction

| Date | Time | Type | Station ID | Duration Digital Fax | Pages | Result |
|------|------|------|------------|----------|-------|--------|
| Nov 7 | 3:51PM | Fax Sent | 13126550801 | 1:12 N/A | 3 | OK |

Note:
An Image of page 1 will appear here only for faxes that are sent as Scan and Fax.

https://0301.xdhosted.com/receipt.asp?txtOrderID=740361





| | |
|---|---|
| Tracking Number: | 740361 |
| Origin: | San Antonio TX  78216- |
| Destination: | San Antonio TX  78227- |
| Ordered By: | David Torres (512) 494-1481 |
| References: | Meltzer - Blast Fitness |
| Order Type: | ASAP |
| Ordered: | 11/07/2014 3:51 PM 3:51 PM |
| Ready: | 11/07/2014 3:48 PM 3:48 PM |
| Due: | 11/07/2014 4:33 PM 4:33 PM |
| Pieces: | 1 |
| Weight: | 1 |
| Charges: | $26.57 |
| Billing Group / Cost Center: | |

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To  Blast Fitness
Street, Apt. No.; or PO Box No.  8725 Marbach Rd
City, State, ZIP+4  San Antonio, Texas 78227

7014 0510 0002 3585 8593

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To  Dallas Health Clubs, Inc.
Street, Apt. No.; or PO Box No.
City, State, ZIP+4  Chicago, Illinois 60631

7014 0510 0002 3585 2446

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To  Dallas Health Clubs, Inc.
Street, Apt. No.; or PO Box No.
City, State, ZIP+4  LA, CA 90067

7014 0510 0002 3585 9415

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To  Bally's Health Club
Street, Apt. No.; or PO Box No.
City, State, ZIP+4  Dallas, Texas 75240

7014 0510 0002 3585 9439

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| Postage | $ | |
| Certified Fee | | Postmark Here |
| Return Receipt Fee (Endorsement Required) | | |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To  Tim Moran Blast Fitness Group
Street, Apt. No.;
City, State, ZIP+4  Auburndale, Mass 02466/21

7014 0510 0002 3585 8609

PS Form 3800, August 2006          See Reverse for Instructions

---

**David Torres**

| | |
|---|---|
| From: | David Torres |
| Sent: | Friday, November 07, 2014 3:58 PM |
| To: | 'greg.hines@blastfitness.com' |
| Subject: | Notice of Default – Blast Fitness – The Gottfried Firm |
| Attachments: | 11-07-14 Blast Fitness.pdf |

Dear Mr. Hines:

I am enclosing a letter prepared by The Gottfried Firm (David M. Gottfried) on behalf of our client, Westheimer Regency I, L.P.

Please review the enclosure and contact our office with any questions.

David M. Torres
Paralegal for David M. Gottfried
The Gottfried Firm
1505 West Sixth street
Austin, Texas 78703
Phone: 512.494.1481
Fax: 512.472.4013



# THE GOTTFRIED FIRM

## A PROFESSIONAL CORPORATION

WEST SIXTH PLACE
1505 WEST SIXTH STREET
AUSTIN, TEXAS 78703

PHONE
512-494-1481

FAX
512-472-4013
david@davidgottfriedlaw.com

October 22, 2015

Bally Health Clubs, Inc.          *via certified mail RRR 7014 0510 0002 3585 0719*
d/b/a President's Health Club
15000 Quorum Drive, Suite 100
Dallas, Texas 75240
Attn: Area Director

Dallas Health Clubs, Inc.          *via certified mail RRR 7014 0510 0002 3585 0726*
c/o Bally's Health & Tennis Corporation
8700 West Bryn Mawr Avenue
Chicago, Illinois 60631
Attn: General Counsel

Dallas Health Clubs, Inc.          *via certified mail RRR 7014 0510 0002 3585 0733*
c/o Bally's Health & Tennis Corporation
2029 Century Park East, Suite 2810
Los Angeles, California 90067
Attn: Director of Property Management

Tom Moran          *via certified mail RRR 7014 0510 0002 3585 0740*
Blast Fitness Group, LLC
2000 Commonwealth Avenue
Auburndale, MA 02466

Blast Fitness          *via certified mail RRR 7014 0510 0002 3585 0757*
6727 NW Loop 410
San Antonio, Texas 78238

Greg Hines          *via email to greg.hines@blastfitness.com*
Regional Vice President Texas
Blast Fitness

Deborah S. Ashen          *via facsimile (312) 655-0801*
Ashen Faulkner
217 Jefferson Street, Suite 601
Chicago, Illinois 60661



EXHIBIT

# NOTICE OF DEFAULT

To whom it may concern,

On behalf of Westheimer Regency I, L.P. (hereafter "Westheimer"), you are hereby notified of your default under the Lease for failure to pay rent for the Property located at 8725 Marbach Road, San Antonio, Texas 78227 (hereafter the "Property"). You have failed to pay rent for December 2014, January 2015, February 2015, March 2015, April 2015, May 2015, June 2015, July 2015, August 2015, September 2015, and October 2015. Under the terms of the lease, you owe $147,000 in rent, $60,615.60 in Monthly NNN fees, and $24,541.61 in CAM billings, for a total of $232,157.21. If such failure continues for ten (10) days after notice, this failure will be a default under the Lease and Westheimer shall take appropriate action.

Very truly yours,

David M. Gottfried

THE LAW OFFICE OF
## DAVID M. GOTTFRIED, P.C.
A Professional Corporation

DAVID M. GOTTFRIED

WEST SIXTH PLACE
1505 WEST SIXTH STREET
AUSTIN, TEXAS 78703
Phone   (512) 494-1481
Fax      (512) 472-4013

SENDER'S EMAIL:
david@davidgottfried.com

## Fax Memorandum

| TO: | Deborah Ashen | FAX NO: | 312-655-0801 |
|---|---|---|---|
| COMP: | | THIS IS PAGE 1 OF 3 PAGES | |
| FROM: | David M. Gottfried | | |
| RE: | Blast Fitness, Lease of 8725 Maybach Road, San Antonio, Texas 78227 | FILE: | |
| DATE: | OCTOBER 23, 2015 | IF THERE ARE PROBLEMS IN TRANSMISSION PLEASE CALL (512) 494-1481 | |

COMMENTS:

Please see attached letter - Notice of Default

*Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this fax message is attorney-client privileged and confidential, intended for the use of the intended recipient named above. If the reader of this message is not the intended recipient (or the employee or agent responsible to deliver it to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error please immediately notify us by collect telephone or return the original message to us at the above address at our expense.*

S:\MELTZER, BRADLEY\BLAST FITNESS LEASE - WESTHEIMER\FAX COVER TO ASHEN.DOCX

# HP Color LaserJet MFP M476nw

## Fax Confirmation

Oct-23-2015  3:35PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 1009 | 10/23/2015 | 3:34:37PM | Send | 13126550801 | 1:00 | 3 | OK |

THE LAW OFFICE OF
DAVID M. GOTTFRIED, P.C.
A Professional Corporation

DAVID M. GOTTFRIED

WEST SIXTH PLACE
1503 WEST SIXTH STREET
AUSTIN, TEXAS 78703
Phone   (512) 494-1481
Fax       (512) 472-0013

SENDER'S E-MAIL:
david@davidgottfried.com

### Fax Memorandum

| To: | Deborah Ashen | FAX NO: | 312-655-0801 |
|-----|---------------|---------|--------------|
| COMP: | | THIS IS PAGE 1 OF 3 PAGES | |
| FROM: | David M. Gottfried | | |
| RE: | Blast Fitness, Lease of 8735 Maybach Road, San Antonio, Texas 78227 | FILE: | |
| DATE: | OCTOBER 23, 2015 | IF THERE ARE PROBLEMS IN TRANSMISSION PLEASE CALL (512) 494-1481 | |

COMMENTS:

Please see attached letter - Notice of Default

Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this fax message is attorney-client privileged and confidential, intended for the use of the intended recipient named above. If the reader of this message is not the intended recipient or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is prohibited. If you have received this communication in error please immediately notify us by collect telephone or return the original message to us at the above address at our expense.
E:\MH\2DA_BRADLEY\BLAST FITNESS LEASE - WESTHEIMER\FAX COVER TO ASHEN.DOCX

**David Torres**

| | |
|---|---|
| From: | David Torres |
| Sent: | Friday, October 23, 2015 3:30 PM |
| To: | 'greg.hines@blastfitness.com' |
| Subject: | 10.23.15 Letter to Hines - Notice of Default re: Westheimer Regency I, L.P. |
| Attachments: | 10.23.15 Letter to Hines - Blast Fitness.pdf |

I am enclosing a letter from David Gottfried regarding Notice of Default (on behalf of Westheimer Regency I, L.P.

Please contact our office with any questions.

David M. Torres
Paralegal
The Gottfried Firm
1505 West Sixth Street
Austin, Texas 78703
Phone: 512.494.1481
Fax: 512.472.4013

*CONFIDENTIAL COMMUNICATION*

¹NOTICE: This e-mail message contains information that may be confidential and exempt from disclosure under applicable law. This e-mail message is also covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged. The information contained in this e-mail is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.*

1

**USPS Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7014 0510 0002 3585 0719

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  Bally's Health Club d/b/a
Street, Apt. No.; or PO Box No.  Presidents Health Club
City, State, ZIP+4

---

**USPS Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7014 0510 0002 3585 0733

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

DISTRICT OF BEXAR COUNTY, TX

Sent To  Dallas Health Club
Street, Apt. No.; or PO Box No.  Re Bally's Health Texas Corp
City, State, ZIP+4

---

**USPS Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7014 0510 0002 3585 0726

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  Dallas Health Clubs, Inc.
Street, Apt. No.; or PO Box No.  Re Bally's Health Texas Corp
City, State, ZIP+4

---

**USPS Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7014 0510 0002 3585 0740

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  Tom Moran, Blast Fitness
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

---

**USPS Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

7014 0510 0002 3585 0757

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  Blast Fitness
Street, Apt. No.; or PO Box No.
City, State, ZIP+4

---



Cause Number: _____

District Court : _____

## Donna Kay M<sup>c</sup>Kinney
## Bexar County District Clerk

## Request for Process

Style: _____    Vs. _____

Request the following process: (Please check all that Apply)

☐ Citation ☐ Notice ☐ Temporary Restraining Order ☐ Notice of Application for Protective Order
☐ Temporary Protective Order ☐ Precept with hearing ☐ Precept *without* a hearing ☐ Writ of Attachment
☐ Writ of Habeas Corpus ☐ Writ of Garnishment ☐ Writ of Sequestration ☐ Capias ☐ Other: _____

**1.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Check One) ☐ *Private Process* ☐ *Sheriff* ☐ *Publication* (Check One) ☐ *Commercial Recorder* ☐ *Hart Beat* ☐ *Courthouse Door*
☐ *Certified Mail* ☐ *Registered Mail* ☐ *Out of County* ☐ *Secretary of State* ☐ *Commissioner of Insurance*

**2.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Check One) ☐ *Private Process* ☐ *Sheriff* ☐ *Publication* (Check One) ☐ *Commercial Recorder* ☐ *Hart Beat* ☐ *Courthouse Door*
☐ *Certified Mail* ☐ *Registered Mail* ☐ *Out of County* ☐ *Secretary of State* ☐ *Commissioner of Insurance*

**3.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Check One) ☐ *Private Process* ☐ *Sheriff* ☐ *Publication* (Check One) ☐ *Commercial Recorder* ☐ *Hart Beat* ☐ *Courthouse Door*
☐ *Certified Mail* ☐ *Registered Mail* ☐ *Out of County* ☐ *Secretary of State* ☐ *Commissioner of Insurance*

**4.**
Name: _____
Registered Agent/By Serving: _____
Address _____
Service Type: (Check One) ☐ *Private Process* ☐ *Sheriff* ☐ *Publication* (Check One) ☐ *Commercial Recorder* ☐ *Hart Beat* ☐ *Courthouse Door*
☐ *Certified Mail* ☐ *Registered Mail* ☐ *Out of County* ☐ *Secretary of State* ☐ *Commissioner of Insurance*

Title of Document/Pleading to be Attached to Process:_____

Name of Attorney/Pro se: _____ Bar Number: _____
Address: _____ Phone Number: _____

Attorney for Plaintiff _____ Defendant _____ Other _____

****IF SERVICE IS NOT PICKED UP WITHIN 14 BUSINESS DAYS, SERVICE WILL BE DESTROYED****

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY):* _____    COURT *(FOR CLERK USE ONLY):* _____

STYLED   WESTHEIMER REGENCY I, L.P. v. BALLY TOTAL FITNESS, ET AL

(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

## 1. Contact information for person completing case information sheet:

Name: RANDALL A. PULMAN
Email: RPULMAN@PULMANLAW.CC
Address: 2161 NW MILITARY, SUITE 400
Telephone: 210-222-9494
City/State/Zip: SAN ANTONIO, TX 78213
Fax: 210-892-1610
Signature: /s/ Randall A. Pulman
State Bar No: TX 16393250

## Names of parties in case:

Plaintiff(s)/Petitioner(s): WESTHEIMER REGENCY I, L.P.

Defendant(s)/Respondent(s):
BALLY TOTAL FITNESS CORP
BLAST FITNESS ACQUISITION LLC
HAROLD DIXON

[Attach additional page as necessary to list all parties]

## Person or entity completing sheet is:
- ☒ Attorney for Plaintiff/Petitioner
- ☐ Pro Se Plaintiff/Petitioner
- ☐ Title IV-D Agency
- ☐ Other:

Additional Parties in Child Support Case:
Custodial Parent:
Non-Custodial Parent:
Presumed Father:

## 2. Indicate case type, or identify the most important issue in the case (select only 1):

### Civil

**Contract**

*Debt/Contract*
- ☐ Consumer/DTPA
- ☒ Debt/Contract
- ☐ Fraud/Misrepresentation
- ☐ Other Debt/Contract:

*Foreclosure*
- ☐ Home Equity—Expedited
- ☐ Other Foreclosure
- ☐ Franchise
- ☐ Insurance
- ☐ Landlord/Tenant
- ☐ Non-Competition
- ☐ Partnership
- ☐ Other Contract:

**Injury or Damage**
- ☐ Assault/Battery
- ☐ Construction
- ☐ Defamation
*Malpractice*
  - ☐ Accounting
  - ☐ Legal
  - ☐ Medical
  - ☐ Other Professional Liability:
- ☐ Motor Vehicle Accident
- ☐ Premises
*Product Liability*
  - ☐ Asbestos/Silica
  - ☐ Other Product Liability List Product:
- ☐ Other Injury or Damage:

**Real Property**
- ☐ Eminent Domain/ Condemnation
- ☐ Partition
- ☐ Quiet Title
- ☐ Trespass to Try Title
- ☐ Other Property:

**Related to Criminal Matters**
- ☐ Expunction
- ☐ Judgment Nisi
- ☐ Non-Disclosure
- ☐ Seizure/Forfeiture
- ☐ Writ of Habeas Corpus— Pre-indictment
- ☐ Other:

### Family Law

**Marriage Relationship**
- ☐ Annulment
- ☐ Declare Marriage Void
*Divorce*
  - ☐ With Children
  - ☐ No Children

**Other Family Law**
- ☐ Enforce Foreign Judgment
- ☐ Habeas Corpus
- ☐ Name Change
- ☐ Protective Order
- ☐ Removal of Disabilities of Minority
- ☐ Other:

**Post-judgment Actions (non-Title IV-D)**
- ☐ Enforcement
- ☐ Modification—Custody
- ☐ Modification—Other

**Title IV-D**
- ☐ Enforcement/Modification
- ☐ Paternity
- ☐ Reciprocals (UIFSA)
- ☐ Support Order

**Parent-Child Relationship**
- ☐ Adoption/Adoption with Termination
- ☐ Child Protection
- ☐ Child Support
- ☐ Custody or Visitation
- ☐ Gestational Parenting
- ☐ Grandparent Access
- ☐ Parentage/Paternity
- ☐ Termination of Parental Rights
- ☐ Other Parent-Child:

### Employment
- ☐ Discrimination
- ☐ Retaliation
- ☐ Termination
- ☐ Workers' Compensation
- ☐ Other Employment:

### Other Civil
- ☐ Administrative Appeal
- ☐ Antitrust/Unfair Competition
- ☐ Code Violations
- ☐ Foreign Judgment
- ☐ Intellectual Property
- ☐ Lawyer Discipline
- ☐ Perpetuate Testimony
- ☐ Securities/Stock
- ☐ Tortious Interference
- ☐ Other:

### Tax
- ☐ Tax Appraisal
- ☐ Tax Delinquency
- ☐ Other Tax

### Probate & Mental Health

*Probate/Wills/Intestate Administration*
- ☐ Dependent Administration
- ☐ Independent Administration
- ☐ Other Estate Proceedings
- ☐ Guardianship—Adult
- ☐ Guardianship—Minor
- ☐ Mental Health
- ☐ Other:

## 3. Indicate procedure or remedy, if applicable (may select more than 1):
- ☐ Appeal from Municipal or Justice Court
- ☐ Arbitration-related
- ☐ Attachment
- ☐ Bill of Review
- ☐ Certiorari
- ☐ Class Action
- ☐ Declaratory Judgment
- ☐ Garnishment
- ☐ Interpleader
- ☐ License
- ☐ Mandamus
- ☐ Post-judgment
- ☐ Prejudgment Remedy
- ☐ Protective Order
- ☐ Receiver
- ☐ Sequestration
- ☐ Temporary Restraining Order/Injunction
- ☐ Turnover

## 4. Indicate damages sought (do not select if it is a family law case):
- ☐ Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
- ☐ Less than $100,000 and non-monetary relief
- ☐ Over $100,000 but not more than $200,000
- ☐ Over $200,000 but not more than $1,000,000

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY MCKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY.  WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:



*February 29, 2016*

**DONNA KAY MCKINNEY**
**BEXAR COUNTY, TEXAS**

By: 

DANIELLE VALDEZ, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

PRIVATE PROCESS                    Case Number: 2016-CI-00441

2016CI00441 S00001

WESTHEIMER REGENCY I LP
VS.
BALLY TOTAL FITNESS CORPORATION ET AL
(Note:Attached Document May Contain Additional Litigants.)

IN THE DISTRICT COURT
166th JUDICIAL DISTRICT
BEXAR COUNTY, TEXAS

## CITATION

"THE STATE OF TEXAS"

Directed To: BALLY TOTAL FITNESS CORPORATION

BY SERVING ITS REGISTERED AGENT, CT CORPORATION SYSTEM

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you." Said petition was filed on the 11th day of January, 2016.

ISSUED UNDER MY HAND AND SEAL OF SAID COURT ON THIS 22ND DAY OF JANUARY A.D., 2016.

PETITION



RANDALL A PULMAN
ATTORNEY FOR PLAINTIFF
2161 NW MILITARY HWY 400
SAN ANTONIO, TX 78213-1878

**Donna Kay McKinney**
**Bexar County District Clerk**
101 W. Nueva, Suite 217
San Antonio, Texas 78205

By: *Victoria R Angeles*, Deputy

OFFICER'S RETURN

I received this citation on _____ at _____o'clock ___.M. and:( ) executed it by delivering a copy of the citation with the date of delivery endorsed on it to the defendant,_____ in person on the _____ at _____o'clock ___.M. at:_____ or ( ) not executed because _____ Fees:_____ Badge/PPS #:_____ Date certification expires:_____

_____County, Texas

By:_____

OR: VERIFICATION OF RETURN (If not served by a peace officer) SWORN TO this _____.

_____
NOTARY PUBLIC, STATE OF TEXAS

OR: My name is_____, my date of birth is_____, and my address is _____, _____(County). I declare under penalty of perjury that the foregoing is true and correct. Executed in _____County, State of Texas, on the _____ day of_____, 20_____.

_____
Declarant

Case Number: null                    Document Type: null                    Page 1 of 3

FILE COPY (DK002)       Page 1 of 2

DOCUMENT SCANNED AS FILED

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK. CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT.  WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*February 29, 2016*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**



By: _____

, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, DONNA KAY McKINNEY, BEXAR COUNTY DISTRICT
CLERK, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE AND CORRECT COPY OF THE ORIGINAL
RECORD NOW IN MY LAWFUL CUSTODY. WITNESS
MY OFFICIAL HAND AND SEAL OF OFFICE ON THIS:

*February 29, 2016*

**DONNA KAY McKINNEY**
**BEXAR COUNTY, TEXAS**

By: _____

, Deputy District Clerk

*(NOT VALID WITHOUT THE CLERKS'S ORIGINAL SIGNATURE.)*